# EXHIBIT D

# AMENDED AND RESTATED OPERATING AGREEMENT

## OF

## SHORES OF PARADISE, LLC

### a Mississippi limited liability company

## AMENDED AND RESTATED

## OPERATING AGREEMENT

THIS AMENDED AND RESTATED OPERATING AGREEMENT is entered effective the 24th day of February, 2006, by and among those Persons listed on the attached Exhibit "A" that execute a counterpart of this Agreement. Capitalized terms used and not otherwise defined herein have the respective meanings set forth in Section 1.8 hereof.

## W I T N E S S E T H:

WHEREAS, the Members are the owners of all of the issued and outstanding limited liability company membership interests of the Company;

WHEREAS, pursuant to the terms and conditions set forth in that certain Investment Agreement (the "Investment Agreement"), dated as of February 23, 2006, by and among the Company, Jerry L. Wallace and Samsara Investments III, LLC, a Delaware limited liability company ("Samsara"), the Company is hereby admitting Samsara as a non-voting Class B Member of the Company in exchange for the consideration described in the Investment Agreement;

WHEREAS, Jerry L. Wallace entered into that certain Operating Declaration of Shores of Paradise, LLC, dated as of February 9, 2005 (the "Original Agreement");

WHEREAS, the Members have decided that it is in the best interests of the Members and the Company to amend and restate the Original Agreement to add Samsara as a party thereto and to amend certain other matters relating to the Company and the Members in light of the above transaction; and

WHEREAS, this Agreement supercedes any operating agreement of the Company, including, but not limited to, the Original Agreement;

NOW, THEREFORE, in consideration of the mutual agreements and covenants set forth below and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

## ARTICLE I
## FORMATION AND TERM OF THE COMPANY

Section 1.1    Formation. The Company was formed on February 10, 2005 for the limited purposes and scope set forth in this Agreement. Except as otherwise specifically provided in this Agreement, the rights and obligations of the Members and the administration and termination of the Company shall be governed by the Act.

Section 1.2    Name. The name of the Company is SHORES OF PARADISE, LLC, under which all business and affairs of the Company shall be conducted.

Section 1.3    Registered Office and Agent; Place of Business; Other Places of Business. The address of the registered office of the Company in the State of Mississippi is located at 2416 14th Street, P.O. Box 740, Gulfport, Mississippi 39502-0740, and the registered

agent for service of process on the Company in the State of Mississippi at such registered office is Amy Gillespie Smith. The principal office of the Company is located at 2416 14th Street, P.O. Box 740, Gulfport, Mississippi 39502-0740 or such other place as the Managing Member may from time to time designate.

### Section 1.4    Purposes.

(a)    The nature of the business and of the purposes to be conducted and promoted by the Company, is to engage solely in the following activities:

(i)    Acquire the land more particularly described in Exhibit "B", attached hereto and made part hereof for all purposes (the "**Land**").

(ii)    To work to develop a plan and develop the Land.

(iii)    To own, hold, sell, assign, transfer, develop, operate, lease, mortgage, pledge and otherwise deal with the Land.

(iv)    To exercise all powers enumerated in the Act or necessary or convenient to the conduct, promotion or attainment of the business or purposes otherwise set forth herein.

(b)    Separateness Covenants:

In order to preserve and ensure its separate and distinct identity, in addition to the other provisions set forth in this Agreement, the Company shall conduct its affairs in accordance with the following provisions:

(i)    It shall maintain Company records and books of account separate from those of any Affiliate.

(ii)    It shall observe all limited liability company formalities.

(iii)    It shall not commingle assets with those of any Affiliate.

(iv)    It shall conduct its own business in its own name.

(v)    It shall maintain financial statements separate from any Affiliate.

(vi)    It shall pay any liabilities out of its own funds, including salaries of any employees, not funds of any Affiliate.

(vii)    It shall maintain an arm's length relationship with any Affiliate.

(viii)    It shall not guarantee or become obligated for the debts of any other entity, including any Affiliate, or hold out its credit as being available to satisfy the obligations of others.

2

(ix)    It shall use stationary, invoices and checks separate from any Affiliate.

(x)    It shall not pledge its assets for the benefit of any other entity, including any Affiliate.

(xi)    It shall hold itself out as an entity separate from any Affiliate.

**Section 1.5    Title to Property.** All real and personal property owned by the Company shall be owned by the Company as an entity and no Member shall have any ownership interest in such property in its individual name or right, and each Member's interest in the Company shall be personal property for all purposes. Except as otherwise provided in this Agreement, the Company shall hold all of its real and personal property in the name of the Company and not in the name of any Member.

**Section 1.6    Term.** The term of the Company commenced on February 10, 2005, the date the Certificate of Formation was filed in the office of the Secretary of State of Mississippi in accordance with the Act, and shall have perpetual existence unless terminated pursuant to the provisions of Section 7.1 hereof or as otherwise provided by law.

**Section 1.7    Independent Activities; Transactions with Affiliates.**

(a)    The Managing Member shall be required to devote such time to the affairs of the Company as the Managing Member deems necessary to manage and operate the Company, and shall be free to serve any other Person or enterprise in any capacity that each may deem appropriate in their discretion.

(b)    Insofar as permitted by applicable law, the Managing Member and each Member may, notwithstanding this Agreement, engage in whatever activities they choose, whether the same are competitive with the Company or otherwise, without having or incurring any obligation to offer any interest in such activities to the Company or any Member and neither this Agreement nor any activity undertaken pursuant hereto shall prevent any Managing Member or Member from engaging in such activities, or require any Managing Member or Member to permit the Company or any Member to participate in any such activities, and as a material part of the consideration for the execution of this Agreement by each Member, each Member hereby waives, relinquishes, and renounces any such right or claim of participation.

**Section 1.8    Definitions.** The following definitions and abbreviations shall be used for purposes of this Agreement:

"**Act**" shall mean the Mississippi Limited Liability Company Act, as amended from time to time (or any corresponding provision of succeeding law).

"**Adjusted Capital Account Deficit**" means, with respect to any Member, the deficit balance, if any, in such Member's Capital Account as of the end of the relevant Fiscal Year, after giving effect to the following adjustments:

(a)    decrease such deficit by any amounts that such Member is obligated to restore pursuant to this Agreement or by operation of law upon liquidation of such Member's Membership Interest or is deemed to be obligated to restore pursuant to Regulations Section 1.704-1(b)(2)(ii)(c) or the penultimate sentence of each of Regulations Sections 1.704-2(g)(1) and 1.704-2(i)(5); and

(b)    increase such deficit by the items described in Regulations Section 1.704-1(b)(2)(ii)(*d*)(4), (5) and (6).

The foregoing definition of *"Adjusted Capital Account Deficit"* is intended to comply with the provisions of Regulations Section 1.704-1(b)(2)(ii)(*d*) and shall be interpreted consistently therewith.

"**Affiliate**" or "**Associate**" means, with respect to any Person, any Person related by blood relationship or marriage, or any Person directly or indirectly controlling or controlled by or under common control with such Person. For purposes of this definition, *"control"* when used with respect to any Person means the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities, by contract or otherwise, and the terms *"controlling"* and *"controlled"* have meanings correlative to the foregoing.

"**Agreement**" shall mean this Operating Agreement, as amended, modified or supplemented from time to time.

"**Available Cash**" shall mean, for any fiscal period, the excess, if any, of (a) the sum of (without duplication) (i) the amount of all cash receipts of the Company during such period from whatever source and (ii) any cash reserves of the Company existing at the start of such period, less (b) the sum of (without duplication) (i) all cash amounts paid or payable in such period on account of expenses and capital expenditures incurred in connection with the Company's business and approved in accordance with the provisions hereof, and (ii) such cash reserves which may be required for the working capital, capital expenditures and future needs of the Company in an amount reasonably determined by the Managing Member.

"**Capital Account**" means, with respect to any Member, the Capital Account maintained for such Member on the Company's books and records in accordance with the following provisions:

(a)    To each Member's Capital Account, there shall be added such Member's Capital Contributions, such Member's allocable share of Net Income and any items of income or gain specially allocated pursuant to Section 3.3 hereof, and the principal amount of any Company liabilities assumed by such Member or that are secured by any property distributed to such Member.

(b)    From each Member's Capital Account, there shall be

4

subtracted the amount of cash and the Gross Asset Value of any property distributed to such Member pursuant to any provision of this Agreement, such Member's allocable share of Net Loss and any items of loss or deductions specially allocated pursuant to Section 3.3 hereof, and the principal amount of any liabilities of such Member assumed by the Company or that are secured by any property contributed by such Member to the Company.

(c)  In the event any interest in the Company is Transferred in accordance with the terms of this Agreement, the transferee shall succeed to the Capital Account of the transferor to the extent that it relates to the Transferred interest.

(d)  In determining the principal amount of any liability for purposes of subsections (a) and (b) hereof, there shall be taken into account Code Section 752(c) and any other applicable provisions of the Code and Regulations.

(e)  The provisions of this Agreement relating to the maintenance of Capital Accounts are intended to comply with Regulations Sections 1.704-1(b) and 1.704-2, and shall be interpreted and applied in a manner consistent with such Regulations. If the Managing Member shall determine that it is prudent to modify the manner in which the Capital Accounts are maintained in order to comply with such Regulations, the Managing Member may make such modification provided that notwithstanding any other provision in this Agreement such modification will not have a material effect on the amounts distributable to any Member without such Member's Consent. The Managing Member also shall (i) make any adjustments that are necessary or appropriate to maintain equality between the Capital Accounts of the Members and the amount of Company capital reflected on the Company's balance sheet, as computed for book purposes, in accordance with Regulations Section 1.704-1(b)(2)(iv)($q$) and (ii) make any appropriate modifications in the event that unanticipated events might otherwise cause this Agreement not to comply with Regulations Section 1.704-1(b) or Section 1.704-2.

"Capital Contribution(s)" means, with respect to any Member, the amount of money and the initial Gross Asset Value of any Contributed Property that such Member contributes to the Company pursuant to Section 2.1 or Section 2.4 hereof.

"Class A Member" shall mean Jerry L. Wallace and any additional or substitute Members admitted to the Company as a Class A Member in accordance with the provisions of this Agreement. The Class A Member shall be entitled to vote upon all matters to be voted upon in relation to the Company.

"Class B Member" shall mean only Samsara Investments III, LLC, a Delaware limited liability company. The Class B Member shall not be entitled to vote upon any matters in relation to the Company (except as provided in Section 5.1 of this

5

Agreement). It is understood and agreed that the Membership Interest of the Class B Member shall be automatically terminated upon the Class B Member's receipt of the Class B Preferred Return, after which Samsara shall no longer be a Member of the Company.

"**Class B Preferred Return**" shall have the meaning set forth in Section 4.1(a).

"**Code**" shall mean the Internal Revenue Code of 1986, as amended and in effect from time to time or any successor statute thereto, as interpreted by the applicable Regulations thereunder.

"**Company**" shall mean Shores of Paradise, LLC, a Mississippi limited liability company, formed on February 10, 2005, by the filing of Certificate of Formation with the Secretary of State of the State of Mississippi, or any successor entity.

"**Company Minimum Gain**" has the meaning set forth in Regulations Section 1.704-2(b)(2) for the phrase "partnership minimum gain," and the amount of Company Minimum Gain, as well as any net increase or decrease in Company Minimum Gain, for a Fiscal Year shall be determined in accordance with the rules of Regulations Section 1.704-2(d).

"**Contributed Property**" means each property or other asset, in such form as may be permitted by the Act, but excluding cash, contributed or deemed contributed to the Company.

"**Depreciation**" means, for each Fiscal Year or other applicable period, an amount equal to the federal income tax depreciation, amortization or other cost recovery deduction allowable with respect to an asset for such year or other period, except that, if the Gross Asset Value of an asset differs from its adjusted basis for federal income tax purposes at the beginning of such year or period, Depreciation shall be in an amount that bears the same ratio to such beginning Gross Asset Value as the federal income tax depreciation, amortization or other cost recovery deduction for such year or other period bears to such beginning adjusted tax basis; *provided, however,* that, if the federal income tax depreciation, amortization or other cost recovery deduction for such year or period is zero, Depreciation shall be determined with reference to such beginning Gross Asset Value using any reasonable method selected by the Managing Member.

"**Fiscal Year**" means the fiscal year of the Company, which is the calendar year.

"**Gross Asset Value**" means, with respect to any asset, the asset's adjusted basis for federal income tax purposes, except as follows:

(a)     The initial Gross Asset Value of any asset contributed by a Member to the Company shall be its fair market value, as agreed to by such Member and the Managing Member, and set forth on Exhibit A with respect to that Member.

(b)     The Gross Asset Values of all Company assets immediately prior to the occurrence of any event described in subparagraph (i), subparagraph (ii),

6

subparagraph (iii), or subparagraph (iv) hereof shall be adjusted to equal their respective gross fair market values, as determined by the Managing Member s using such reasonable method of valuation as it may adopt, as of the following times:

>  (i)     the acquisition of an additional interest in the Company (other than in connection with the execution of this Agreement) by a new or existing Member in exchange for more than a *de minimis* Capital Contribution, if the Managing Member reasonably determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company;

>  (ii)     the distribution by the Company to a Member of more than a *de minimis* amount of Company property as consideration for an interest in the Company, if the Managing Member reasonably determine that such adjustment is necessary or appropriate to reflect the relative economic interests of the Members in the Company;

>  (iii)     the liquidation of the Company within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g); and

>  (iv)     at such other times as the Managing Member shall reasonably determine necessary or advisable in order to comply with Regulations Sections 1.704-1(b) and 1.704-2.

(c)     The Gross Asset Value of any Company asset distributed to a Member shall be the gross fair market value of such asset on the date of distribution as determined by the Managing Member.

(d)     At the election of the Managing Member, the Gross Asset Values of Company assets shall be increased (or decreased) to reflect any adjustments to the adjusted basis of such assets pursuant to Code Section 734(b) or Code Section 743(b), but only to the extent that such adjustments are taken into account in determining Capital Accounts pursuant to Regulations Section 1.704-1(b)(2)(iv)(*m*); *provided, however*, that Gross Asset Values shall not be adjusted pursuant to this paragraph (d) to the extent that the Managing Member reasonably determine that an adjustment pursuant to paragraph (b) above is necessary or appropriate in connection with a transaction that would otherwise result in an adjustment pursuant to this paragraph (d).

(e)     If the Gross Asset Value of a Company asset has been determined or adjusted pursuant to paragraph (a), paragraph (b) or paragraph (d) above, such Gross Asset Value shall thereafter be adjusted by the Depreciation taken into account with respect to such asset for

7

purposes of computing Net Income and Net Loss.

"**Land**" shall have the meaning given such term in Section 1.4.

"**Liquidating Event**" shall have the meaning given such term in Section 7.1.

"**Managing Member**" shall mean, individually and collectively, the Managing Member of the Company appointed pursuant to Section 5.1, or any additional, replacement or successor Managing Member appointed pursuant to Section 5.1.

"**Member**" or "**Members**" shall mean the Class A Members and the Class B Members.

"**Member Loan**" means amounts transferred to the Company by a Member as a loan. With respect to Section 3.3, the term "Member Loan" shall also mean liabilities of the Company for which a Member (or a Person related to such Member under Regulation §1.752-4(b)) bears the economic risk of loss (within the meaning of Regulation §1.752-2(b)-(j)).

"**Member Minimum Gain**" means an amount, with respect to each Member Nonrecourse Debt, equal to the Company Minimum Gain that would result if such Member Nonrecourse Debt were treated as a Nonrecourse Liability, determined in accordance with Regulations Section 1.704-2(i) with respect to "partner nonrecourse debt minimum gain."

"**Member Nonrecourse Debt**" has the meaning set forth in Regulations Section 1.704-2(b)(4) for the phrase "partner nonrecourse debt."

"**Member Nonrecourse Deductions**" has the meaning set forth in Regulations Section 1.704-2(i)(2) for the phrase "partner nonrecourse deductions," and the amount of Member Nonrecourse Deductions with respect to a Member Nonrecourse Debt for a Fiscal Year shall be determined in accordance with the rules of Regulations Section 1.704-2(i)(2).

"**Member Nonrecourse Liability**" has the meaning set forth in Regulations Section 1.752-1(a)(2).

"**Membership Interest**" means, with respect to any Member, the ownership interest of such Member in the Company (which shall be considered personal property for all purposes), consisting of (i) such Member's Percentage Interest in Profits, Losses, other allocations and distributions, (ii) such Member's right, if any, to vote or grant or withhold consents with respect to Company matters as provided herein or in the Act, and (iii) such Member's other rights and privileges, as provided herein or in the Act. A Member has no interest in any specific Company property.

"**Nonrecourse Deductions**" has the meaning set forth in Regulations Section 1.704-2(b)(1), and the amount of Nonrecourse Deductions for a Fiscal Year shall be determined in accordance with the rules of Regulations Section 1.704-2(c).

8

"**Nonrecourse Liability**" has the meaning set forth in Regulations Section 1.752-1(a)(2).

"**Person**" shall mean any individual, membership, corporation, trust, or other entity.

"**Profit**" and "**Losses**" mean, for each Fiscal Year of the Company, an amount equal to the Company's taxable income or loss for such year, determined in accordance with Code Section 703(a) (for this purpose, all items of income, gain, loss or deduction required to be stated separately pursuant to Code Section 703(a)(1) shall be included in taxable income or loss), with the following adjustments:

(a)    Any income of the Company that is exempt from federal income tax and not otherwise taken into account in computing Profit (or Loss) pursuant to this definition of "*Profit*" or "*Loss*" shall be added to (or subtracted from, as the case may be) such taxable income (or loss);

(b)    Any expenditure of the Company described in Code Section 705(a)(2)(B) or treated as a Code Section 705(a)(2)(B) expenditure pursuant to Regulations Section 1.704-1(b)(2)(iv)(*i*), and not otherwise taken into account in computing Profit (or Loss) pursuant to this definition of "*Profit*" or "*Loss*," shall be subtracted from (or added to, as the case may be) such taxable income (or loss);

(c)    In the event that the Gross Asset Value of any Company asset is adjusted pursuant to subsection (b) or subsection (c) of the definition of "*Gross Asset Value*," the amount of such adjustment shall be taken into account as gain or loss from the disposition of such asset for purposes of computing Profit or Loss;

(d)    In lieu of the depreciation, amortization and other cost recovery deductions that would otherwise be taken into account in computing such taxable income or loss, there shall be taken into account Depreciation for such Fiscal Year;

(e)    To the extent that an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required pursuant to Regulations Section 1.704-1(b)(2)(iv)(*m*)(*4*) to be taken into account in determining Capital Accounts as a result of a distribution other than in liquidation of a Member's interest in the Company, the amount of such adjustment shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases the basis of the asset) from the disposition of the asset and shall be taken into account for purposes of computing Profit or Loss; and

(f)    Notwithstanding any other provision of this definition of "*Profit*" or "*Loss*," any item of income, gain, loss or deduction specially

9

allocated pursuant to Section 3.3(a) hereof shall not be taken into account in computing Profit or Loss. The amounts of the items of Company income, gain, loss or deduction available to be allocated pursuant to Section 3.3(a) hereof shall be determined by applying rules analogous to those set forth in this definition of *"Profit"* or *"Loss.*

"**Regulations**" means the Income Tax Regulations promulgated under the Code, as such Regulations may from time to time be amended.

"**Transfer,**" when used with respect to a Membership Interest or all or any portion of a Membership Interest, means any sale, assignment, bequest, conveyance, devise, gift (outright or in trust), pledge, encumbrance, hypothecation, mortgage, exchange, transfer or other disposition or act of alienation, whether voluntary or involuntary or by operation of law. The terms *"Transferred"* and *"Transferring"* have correlative meanings.

To the extent that capitalized terms appear in this Agreement but are not defined above in this Article, such term shall have the meaning otherwise set forth in this Agreement.

## ARTICLE II
## CONTRIBUTIONS AND MEMBERSHIP INTERESTS

**Section 2.1   Initial Capital Contributions.**   Each Member has made a Capital Contribution in the amount and in the manner set forth in Exhibit "A" attached hereto.

**Section 2.2   Loans by Third Parties.**   With the prior written approval of the Class B Member (except that such approval shall not be required with respect to the Acquisition Loan, as such term is defined in the Investment Agreement), the Managing Member may solicit, negotiate and obtain on behalf of the Company, financing upon such reasonable commercial terms as the Managing Member reasonably determine to be appropriate; *provided, however,* that any such debt shall be nonrecourse to each Member unless the Member to whom any debt would be recourse otherwise agrees.

**Section 2.3   Additional Capital Contributions.**   No Member shall be required to make additional Capital Contributions to the Company. However, with the prior written approval of all Members, any Member may make additional Capital Contributions.

**Section 2.4   Return of Contributions.**   Except as otherwise specifically provided in this Agreement, no Member shall have the right to withdraw any part of its capital contribution.

**Section 2.5   Changes in Company Interests.** Upon the contribution to, or distribution from, the Company of property in connection with the admission to, or retirement from, the Company of a Member or a change in the interest of a Member in the Company, the assets of the Company shall be revalued on the books of the Company to reflect the fair market value of such assets at the time of the occurrence of such event, and the Capital Accounts of the Members shall be adjusted in the manner provided under Treasury Regulation Section 1.704-1(b)(2)(iv)(f) and (g).

Section 2.6    **Termination of Membership Interest of the Class B Member**.    It is understood and agreed that the Membership Interest of the Class B Member shall be automatically terminated upon the Class B Member's receipt of the Class B Preferred Return (regardless of whether such payment of the Class B Preferred Return is made by the Company pursuant to this Agreement, by the Class A Member pursuant to the terms of the Guaranty (as such term is defined in the Investment Agreement), or by a combination thereof), after which Samsara shall no longer be a Member of the Company or have any interest in the Company whatsoever.

## ARTICLE III
## PROFIT OR LOSS AND ALLOCATIONS

Section 3.1    **Timing and Amount of Allocations of Profits and Losses**.    Profits and Loss of the Company shall be determined and allocated with respect to each Fiscal Year of the Company as of the end of each such year.    Except as otherwise provided in this Article III, an allocation to a Member of a share of Profits or Loss shall be treated as an allocation of the same share of each item of income, gain, loss or deduction that is taken into account in computing Profit or Loss.

Section 3.2    **General Allocations**.    Profits and Loss shall be allocated as follows:

    (a)    Profits shall be allocated in the following order of priority:

        (i)    First, to the Members in reverse order of and in amounts equal to the difference between (A) the aggregate Losses previously allocated to the Members over (B) the aggregate Profits allocated to the Members pursuant to this Section 3.2(a)(i);

        (ii)    Second, 100% to the Class B Member until the aggregate allocations made under this Section 3.2(a)(ii) equal the difference between (A) the Class B Preferred Return (computed through the date of the applicable allocation) over (B) the Class B Member's initial Capital Account Balance; and

        (iii)    Third, 100% to the Class A Member.

    (b)    Losses shall be allocated 100% to the Class B Member.

Section 3.3    **Additional Allocation Provisions.**

    (a)    **Regulatory Allocations**

        (i)    **Minimum Gain Chargeback**.    Except as otherwise provided in Regulations Section 1.704-2(f), notwithstanding the provisions of Section 3.2 hereof, or any other provision of this Article III, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, as determined under Regulations Section 1.704-2(g).    Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.    The items to be allocated shall be determined in accordance with Regulations Sections 1.704-2(f)(6) and 1.704-2(j)(2).

11

This Section 3.3(a)(i) is intended to qualify as a *"minimum gain chargeback"* within the meaning of Regulations Section 1.704-2(f) and shall be interpreted consistently therewith.

(ii)    <u>Member Minimum Gain Chargeback</u>. Except as otherwise provided in Regulations Section 1.704-2(i)(4) or in Section 3.3(a)(i) hereof, if there is a net decrease in Member Minimum Gain attributable to a Member Nonrecourse Debt during any Fiscal Year, each Member who has a share of the Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(5), shall be specially allocated items of Company income and gain for such year (and, if necessary, subsequent years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain attributable to such Member Nonrecourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Regulations Sections 1.704-2(i)(4) and 1.704-2(j)(2). This Section 3.3(a)(ii) is intended to qualify as a *"chargeback of partner nonrecourse debt minimum gain"* within the meaning of Regulations Section 1.704-2(i) and shall be interpreted consistently therewith.

(iii)    <u>Member Nonrecourse Deductions</u>. Any Member Nonrecourse Deductions for any Fiscal Year shall be specially allocated to the Member(s) who bears the economic risk of loss with respect to the Member Nonrecourse Debt to which such Member Nonrecourse Deductions are attributable, in accordance with Regulations Section 1.704-2(i).

(iv)    <u>Qualified Income Offset</u>. If any Member unexpectedly receives an adjustment, allocation or distribution described in Regulations Section 1.704-1(b)(2)(ii)(*d*)(*4*), (*5*) or (*6*), items of Company income and gain shall be allocated, in accordance with Regulations Section 1.704-1(b)(2)(ii)(*d*), to such Member in an amount and manner sufficient to eliminate, to the extent required by such Regulations, the Adjusted Capital Account Deficit of such Member as quickly as possible, provided that an allocation pursuant to this Section 3.3(a)(iv) shall be made if and only to the extent that such Member would have an Adjusted Capital Account Deficit after all other allocations provided in this Article 6 have been tentatively made as if this Section 3.3(a)(iv) were not in the Agreement. It is intended that this Section 3.3(a)(iv) qualify and be construed as a *"qualified income offset"* within the meaning of Regulations Section 1.704-1(b)(2)(ii)(*d*) and shall be interpreted consistently therewith.

(v)    <u>Limitation on Allocation of Net Loss</u>. To the extent that any allocation of Loss would cause or increase an Adjusted Capital Account Deficit as to any Member, such allocation of Loss shall be reallocated among the other Members in accordance with their respective Membership Interests.

(vi)    <u>Section 754 Adjustment</u>. To the extent that an adjustment to the adjusted tax basis of any Company asset pursuant to Code Section 734(b) or Code Section 743(b) is required, pursuant to Regulations Section 1.704-1(b)(2)(iv)(*m*)(*2*) or Regulations Section 1.704-1(b)(2)(iv)(*m*)(*4*), to be taken into account in determining Capital Accounts as the result of a distribution to a Member in complete liquidation of its interest in the Company, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the basis of the asset) or loss (if the adjustment decreases such basis), and such gain or loss shall be specially allocated to the Members in accordance with their Percentage

Interests in the event that Regulations Section 1.704-1(b)(2)(iv)(*m*)(*2*) applies, or to the Members to whom such distribution was made in the event that Regulations Section 1.704-1(b)(2)(iv)(*m*)(*4*) applies.

(vii)    <u>Curative Allocations</u>.    The allocations set forth in Sections 6.3.A(1) through (6) hereof (the "Regulatory Allocations") are intended to comply with certain regulatory requirements, including the requirements of Regulations Sections 1.704-1(b) and 1.704-2. Notwithstanding the provisions of Section 3.1 or 3.2 hereof, the Regulatory Allocations shall be taken into account in allocating other items of income, gain, loss and deduction among the Members so that, to the extent possible without violating the requirements giving rise to the Regulatory Allocations, the net amount of such allocations of other items and the Regulatory Allocations to each Member shall be equal to the net amount that would have been allocated to each such Member if the Regulatory Allocations had not occurred.

(b)    **Allocation of Excess Nonrecourse Liabilities.**    Solely for purposes of determining a Member's proportional share of the *"excess nonrecourse liabilities"* of the Company within the meaning of Regulations Section 1.752-3(a)(3), each Member's interest in Company profits shall be equal to such Member's Percentage Interest.

**Section 3.4    <u>Tax Allocations.</u>**

(a)    **In General.**    Except as otherwise provided in this Section 3.4, for income tax purposes under the Code and the Regulations, each Company item of income, gain, loss and deduction (collectively, "Tax Items") shall be allocated among the Members in the same manner as its correlative item of *"book"* income, gain, loss or deduction is allocated pursuant to Sections 3.2 and 3.3 hereof.

(b)    **Allocations Respecting Section 704(c) Revaluations.**    Notwithstanding Section 3.4(a) hereof, Tax Items with respect to any asset that is contributed to the Company with a Gross Asset Value that varies from its basis in the hands of the contributing Member immediately preceding the date of contribution shall be allocated among the Members for income tax purposes pursuant to such method as shall be chosen by the Managing Member under Section 704(c) and the applicable Regulations. In the event that the Gross Asset Value of any Company asset is adjusted pursuant to subsection (b) of the definition of "Gross Asset Value" (provided in Article 1 hereof), subsequent allocations of Tax Items with respect to such asset shall take account of the variation, if any, between the adjusted basis of such asset and its Gross Asset Value in such names as chosen by the Managing Member under Code Section 704(c) and the applicable Regulations.

**Section 3.5    <u>Other Provisions.</u>**

(a)    **Other Allocations.**    In the event that (i) any modifications are made to the Code or any Regulations, (ii) any changes occur in any case law applying or interpreting the Code or any Regulations, (iii) the IRS changes or clarifies the manner in which it applies or interprets the Code or any Regulations or any case law applying or interpreting the Code or any Regulations or (iv) the IRS adjusts the reporting of any of the transactions contemplated by this Agreement which, in each case, either (a) requires allocations of items of income, gain, loss, deduction or credit or (b) requires reporting of any of the transactions contemplated by this

13

Agreement in a manner different from that set forth in this Article III, the Managing Member are hereby authorized to make new allocations or report any such transactions (as the case may be) in reliance of the foregoing, and such new allocations and reporting shall be deemed to be made pursuant to the fiduciary duty of the Managing Member to the Company and the other Members, and no such new allocation or reporting shall give rise to any claim or cause of action by any Member.

(b)    **Consistent Tax Reporting.** The Members acknowledge and are aware of the income tax consequences of the allocations made by this Article III and hereby agree to be bound by the provisions of this Article III in reporting their shares of Profit, Loss and other items of income, gain, loss, deduction and credit for federal, state and local income tax purposes.

## ARTICLE IV
## DISTRIBUTIONS

Section 4.1    **Distributions of Available Cash.** The Managing Member shall cause the Company to distribute, at such time or times and in such amounts reasonably deemed appropriate by the Managing Member, Available Cash to the Members in accordance with the following distribution priority schedule:

(a)    To the Class B Member, until the Class B Member has received an amount equal to 170% of its initial Capital Contribution (the "Class B Preferred Return"); and

(b)    The remainder to the Class A Member.

If and to the extent that the Company has not paid to the Class B Member the full amount of the Class B Preferred Return described in Section 4.1(a) above on or before February 26, 2007, then the remaining amount of the Class B Preferred Return payable to the Class B Member as of such date shall accrue simple interest, at a rate of seventy-five percent (75%) per annum, from February 27, 2007, through the earliest to occur of (i) the date of full payment of the Class B Preferred Return, (ii) August 27, 2007 and (iii) the sale of the Land pursuant to Section 5.7 hereof. The Class B Preferred Return, together with the interest payable thereon after February 27, 2007 is also herein referred to as the "Class B Preferred Return", as applicable.

Section 4.2    **Distributions in Kind.** No right is given to any Member to demand and receive property other than cash. The Managing Member may, with the unanimous consent of all Members, determine to make a distribution in kind to the Members of Company assets, and such assets shall be distributed in such a fashion as to ensure that the fair market value is distributed and allocated in accordance with Articles III and IV hereof.

## ARTICLE V
## MANAGEMENT

Section 5.1    **Management of Company.** The overall management and control of the Company shall be vested in a Managing Member who shall in good faith use his best efforts to implement or cause to be implemented, and be responsible for the implementation of, all decisions and for conducting, at the expense of the Company, the ordinary and usual day-to-day business and affairs of the Company, including, without limitation, those functions enumerated

14

in Section 5.3. The Managing Member shall be the Class A Member or his designee; provided, however, that if (a) if the Company has not paid to the Class B Member the full amount of the Class B Preferred Return on or before February 26, 2007, and (b) the Company owns the DB Biloxi Property and the Ms. Hamill Property (as such terms are defined in the Investment Agreement) as of such date, then the Class B Member becomes the sole Managing Member, and acquires all voting rights associated therewith and the sole right to take the actions described in Section 5.3, until such time as the Membership Interest of the Class B Member is terminated as provided herein.

Section 5.2   **Indemnity.**   The Company shall indemnify and hold harmless any Managing Member, employee, agent or representative of the Company, against all liabilities, losses and damages incurred by any of them by reason of any act performed or omitted to be performed in the name of or on behalf of the Company, or in connection with the Company's business, including attorneys' fees and any amounts expended in the settlement of any claims or liabilities, losses or damages, to the fullest extent permitted by the Act or other applicable law.

Section 5.3   **Rights, Powers and Duties of the Managing Member.**   Except as otherwise provided in Section 5.1, each Managing Member shall have the full, exclusive and complete authority and discretion in the management and control of the business of the Company for the purposes herein stated and shall make all decisions affecting the business of the Company. The Managing Member shall manage and control the affairs of the Company to the best of his ability and shall use his best efforts to carry out the business of the Company. In connection therewith, the powers of the Managing Member include, but are not limited to, the power to:

(a)   Prosecute, defend, waive, settle or compromise claims and causes of actions (in contract, tort or otherwise) by or against the Company.

(b)   Take and hold all real, personal and mixed property of the Company in the name of the Company.

(c)   Open and maintain checking, savings, brokerage and other bank and investment accounts as the Managing Member may deem necessary or appropriate.

(d)   Purchase, at the expense of the Company, liability and other insurance to protect the Company's business, any real or personal property of the Company and the Managing Member from liabilities arising out of the Company's business.

(e)   Adopt Budgets and/or incur obligations and make expenditures on behalf of the Company.

(f)   Prepare and file all real and personal property tax returns required to be filed by the Company.

(g)   Prepare and file all federal and state income tax returns required to be filed by the Company.

(h)   Buy, sell or otherwise dispose or transfer of any interest in the Company's

15

assets in the ordinary course of business;

   (i) File for bankruptcy (with the prior written approval of the Class B Member);

   (j) Approve any annual business plan or budget of the Company, or materially deviate from any particular provision or line item of the business plan or budget;

   (k) Make any decisions relating to the issuance of additional membership interests or other securities, subject to the limitations provided herein;

   (l) Make or revoke any tax election of the Company; or

   (m) Dissolve the Company after the payment of the Class B Preferred Return.

  **Section 5.4** **Compensation**. The Managing Member shall not receive any salary or other compensation for services to be rendered to the Company. The Managing Member shall be reimbursed by the Company for reasonable out-of-pocket expenses incurred on behalf of the Company and in connection with the business and affairs of the Company.

  **Section 5.5** **Member Voting**. Unless specifically provided herein to the contrary, any action or decision that requires the consent or approval of the Members, that may be taken or approved by the Members, or that can be taken with the consent or approval of the Members, shall require the consent or approval of Members holding a majority of the outstanding voting Membership Interests. Any action that may be taken at a meeting may be taken by the members or the Managing Member without a meeting.

  **Section 5.6** **Sale of the Land**. If the Class B Member becomes the Managing Member pursuant to Section 5.1 of this Agreement, the Class B Member shall have the right, without the approval of any other Member of the Company, to sell the Land for a price not less than the amount owed to any Lender holding the first lien indebtedness on the Land.

  **Section 5.7** **Additional Right to Require Sale of the Land**. If the Class B Preferred Return is not returned to the Class B Member by February 27, 2007, and if the Class B Member shall not become the Managing Member pursuant to Section 5.1 of this Agreement, then the Managing Member shall be obligated to sell the Land to any Person designated in writing by the Class B Member, including, without limitation, an Affiliate of the Class B Member, for a cash purchase price which is not less than the amount owed to any lender holding the first lien indebtedness on the Land, subject to no other liens or encumbrances other than those exceptions to title which existed as of the date of acquisition of the Land by the Company. Such sale shall be consummated within thirty (30) days following written request therefor from the Class B Member.

**ARTICLE VI**
**TRANSFER OF INTERESTS IN COMPANY**

  **Section 6.1** **Prohibited Transfers**. Except as set forth in this Article VI, no Member shall Transfer all or any part of his or its Interest without the prior written consent of the Managing Member, which may be withheld in his sole and absolute discretion. Any attempt to

16

so Transfer any such interest shall be null and void; provided that, if the Company is required to recognize such Transfer, the Transferred Membership Interest shall be strictly limited to the transferor's rights to allocations and distributions as provided by this Agreement with respect to the Transferred Membership Interest, which allocations and distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Membership Interest may have to the Company. In the case of a Transfer or attempted Transfer in contravention of this Agreement, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability, and damages that any of such indemnified Persons may incur (including, without limitation, incremental tax liability and lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

Section 6.2 **Withdrawal**. Except as provided by this Article VI or by Section 2.6 hereof, no Member may withdraw from the Company.

Section 6.3 **Rights of Unadmitted Assignees**. A Person who acquires all or a portion of a Percentage Interest but who is not admitted as a substituted Member pursuant to Section 6.4 hereof, shall be entitled only to allocations and distributions with respect to such interest in accordance with this Agreement, and shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Managing Member under the Act or this Agreement.

Section 6.4 **Admission of Interest Holders as Members**. Subject to the other provisions of this Article VI, a transferee of an Interest (or portion thereof) may be admitted to the Company as a substituted Member only upon satisfaction of the conditions set forth below in this Section 6.4:

(a) The Managing Member consent to such admission, which consent may be withheld in the sole and absolute discretion of the Managing Member.

(b) The transferee becomes a party to this Agreement as a Member and executes such documents and instruments as the Managing Member may reasonably request (including, without limitation, amendments to the Certificate) as may be necessary or appropriate to confirm such transferee as a Member in the Company and such transferee's agreement to be bound by the terms and conditions hereof;

(c) The transferee pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Company incurs in connection with the admission of the transferee as a Member with respect to the Transferred Percentage Interest; and

(d) If the transferee provides the Company with evidence satisfactory to counsel for the Company of the authority of the transferee to become a Member and to be bound by the terms and conditions of this Agreement and that such Transfer does not violate the Securities Act of 1933, as amended or any state securities laws.

Section 6.5  **Admission of New Members.**  Notwithstanding any other provision of this Agreement to the contrary, the Company may not admit any new Members to the Company (i) until the Class B Member is no longer a Member of the Company or (ii) unless the Class B Member consents to such admission.

## ARTICLE VII
## TERMINATION AND LIQUIDATION DISTRIBUTION

Section 7.1  **Liquidating Events.**  The Company shall dissolve and commence winding up and liquidating upon the first to occur of any of the following (each, a "Liquidating Event"):

(a)  The sale of all or substantially all of the assets of the Company;

(b)  The vote of the Members to dissolve, wind up, and liquidate the Company; or

(c)  The happening of any other event that makes it unlawful, impossible, or impractical to carry on the business of the Company.

The Members hereby agree that, notwithstanding any provision of the Act, the Company shall not dissolve prior to the occurrence of a Liquidating Event.  Upon the occurrence of any event set forth in Section 7.1(a) hereof, the Company shall not be dissolved or required to be wound up if (x) at the time of such event there is at least one remaining Member and that Member carries on the business of the Company (any such remaining Member being hereby authorized to carry on the business of the Company), or (y) within ninety (90) days after such event all remaining Members agree in writing to continue the business of the Company.

Section 7.2  **Winding Up.**  Upon the occurrence of a Liquidating Event, the Company shall continue solely for the purposes of winding up its affairs in an orderly manner, liquidating its assets, and satisfying the claims of its creditors, and no Member shall take any action that is inconsistent with, or not necessary to or appropriate for, the winding up of the Company's business and affairs.  To the extent not inconsistent with the foregoing, all covenants and obligations in this Agreement shall continue in full force and effect until such time as the Company's Property has been distributed pursuant to this Section 7.2.  The Members shall be responsible for overseeing the winding up and dissolution of the Company, shall take full account of the Company's liabilities and Property, shall cause the Property to be liquidated as promptly as is consistent with obtaining the fair value thereof, and shall cause the proceeds therefrom, to the extent sufficient therefor, to be applied and distributed in the following order:

(a)  First, to the payment and discharge of all of the Company's debts and liabilities to creditors other than the Members;

(b)  Second, to the payment and discharge of all the Company's debts and liabilities to Members; and

(c)  The balance, if any, to the Members in accordance with Section 4.1 of this Agreement.

18

No Member shall receive any additional compensation for any services performed pursuant to this Section 7.2. Each Member understands and agrees that by accepting the provisions of this Section 7.2 setting forth the priority of the distribution of the assets of the Company to be made upon its liquidation, such Member expressly waives any right which it, as a creditor of the Company, might otherwise have under the Act to receive distributions of assets pari passu with the other creditors of the Company in connection with a distribution of assets of the Company in satisfaction of any liability of the Company, and hereby subordinates to said creditors any such right.

Section 7.3    **Compliance With Certain Requirements of Regulations; Deficit Capital Accounts.** In the event the Company is "liquidated" within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g), distributions shall be made pursuant to this Article VII to the Members who have positive Capital Accounts in compliance with Regulations Section 1.704-1(b)(2)(ii)(b)(2) (after giving effect to all contributions, distributions, and allocations for all Fiscal Years, including the Fiscal Year during which such liquidation occurs). If any Member has a deficit balance in his Capital Account (after giving effect to all contributions, distributions, and allocations for all Fiscal Years, including the Fiscal Year during which such liquidation occurs), such Member shall have no obligation to make any contribution to the capital of the Company with respect to such deficit, and such deficit shall not be considered a debt owed to the Company or any other Person for any purpose whatsoever. In the discretion of the Members, a pro rata portion of the distributions that would otherwise be made to the Members and pursuant to this Section 7.3 may be:

(a)    distributed to a trust established for the benefit of the Members for the purposes of liquidating Company assets, collecting amounts owed to the Company, and paying any contingent or unforeseen liabilities or obligations of the Company or of the Members arising out of or in connection with the Company. The assets of any such trust shall be distributed to the Members from time to time, in the reasonable discretion of the Members, in the same proportions as the amount distributed to such trust by the Company would otherwise have been distributed to the Members pursuant to Section 7.2 hereof; or

(b)    withheld to provide a reasonable reserve for Company liabilities (contingent or otherwise) and to reflect the unrealized portion of any installment obligations owed to the Company, provided that such withheld amounts shall be distributed to the Members as soon as practicable.

Section 7.4    **Rights of Members.** Except as otherwise provided in this Agreement, (a) each Member shall look solely to the assets of the Company for the return of his Capital Contribution and shall have no right or power to demand or receive property other than cash from the Company, and (b) no Member shall have priority over any other Member as to the return of his Capital Contributions, distributions, or allocations, except as set forth in Section 4.1.

Section 7.5    **No Petition for Dissolution.** The parties agree that irreparable damages would be done to the good will and reputation of the Company if any Member should bring an action in any court to dissolve the Company and to have a liquidator or receiver for the Company appointed. Care has been taken in this Agreement to provide what the parties feel is fair and just payment in liquidation of the interest of all Members. Accordingly, each Member hereby waives and renounces any right to file or pursue any such petition for dissolution of the Company or to

19

seek the appointment by any court of a liquidator or receiver for the Company.

Section 7.6    **Deemed Distribution and Recontribution**.  Notwithstanding any other provisions of this Article VII, in the event the Company is liquidated within the meaning of Regulations Section 1.704-1(b)(2)(ii)(g) but no Liquidating Event has occurred, the Property shall not be liquidated, the Company's liabilities shall not be paid or discharged, and the Company's affairs shall not be wound up.  Instead, solely for federal income tax purposes, the Company shall be deemed to have distributed the Property in kind to the Members, who shall be deemed to have assumed and taken subject to all Company liabilities, all in accordance with their respective Capital Accounts.   Immediately thereafter, the Members shall be deemed to have recontributed the Property in kind to the Company, which shall be deemed to have assumed and taken subject to all such liabilities.

### ARTICLE VIII
### FINANCIAL AND TAX MATTERS

Section 8.1    **Fiscal Year**.  The Fiscal Year of the Company for both reporting and federal income tax purposes shall begin with the first day of January and end on the last day of December in each calendar year.

Section 8.2    **Banking**.  All funds of the Company shall be deposited in the name of the Company in one (1) or more bank or investment accounts at such financial institutions as the Members shall deem appropriate.  Funds shall be withdrawn only by the Managing Member or their authorized representatives.

Section 8.3    **Accounting Decisions**.  All decisions as to accounting matters, except as specifically provided to the contrary herein, shall be made by the Managing Member in accordance with generally accepted accounting methods and procedures applied in a consistent manner.  Such decisions must be acceptable to the Company's accountants, and the Managing Member may rely upon the advice of the accountants as to whether a decision is in accordance with generally accepted accounting principles.

Section 8.4    **Reserves**.  The Company shall maintain reasonable reserves for normal working capital and contingencies to the extent that funds are available for that purpose.

Section 8.5    **Tax Matters Partner**.  Jerry L. Wallace is hereby designated as the "Tax Matters Partner" for the purposes of Subchapter C of Chapter 63 of Subtitle F of the Code (Sections 6221-6233 of the Code) and shall have the authority to exercise all functions provided for in said sections, or in the Treasury Regulations promulgated thereunder, including, to the extent permitted by such Treasury Regulations, the authority to delegate the function of "Tax Matters Partner" to any other person.  The Tax Matters Partner may be changed by the Managing Member.

Section 8.6    **Tax Election**.  Upon the transfer of an interest in the Company or in the event of a distribution of the Company's property, the Tax Matters Partner may elect, pursuant to Section 754 of the Code, to adjust the basis of the Company's Property as allowed by Section 734(b) and Section 743(b) thereof.  The Tax Matters Partner shall be authorized to make any and

20

all other elections beneficial to the Company allowed by the Code.

      **Section 8.7**   **Adjustments to Tax Basis**. In the event of adjustment to the adjusted tax basis of Company Property under Sections 732, 734 or 743 of the Code, the Capital Accounts of the Members shall be adjusted to the extent provided in Treasury Regulations Section 1.704-1(b)(2)(iv)(m).

      **Section 8.8**   **Insurance**. The Company shall obtain insurance in commercially reasonable amounts on any real property owned by the Company on such terms and for such amounts as of the Managing Member deems appropriate in its sole and absolute discretion.

      **Section 8.9**   **Reports**. The Company will use reasonable efforts to deliver or cause to be delivered, by March 31 (and, in any event, will deliver not later than July 31) of each year, to each person who was a Member at any time during the previous Taxable Year, all information necessary for the preparation of such person's United States federal income tax returns and any state and local income tax returns which such person is required to file as a result of the Company being engaged in a trade or business within such state or local jurisdiction, including, without limitation: (a) a copy of the Company's Federal Income Tax Form 1065 as well as such Member's Schedule K-1 to such Form 1065; and (b) a statement showing such person's share of income, gains, losses, deductions and credits for such year for United States federal income tax purposes (and, if applicable, state or local income tax purposes) and the amount of any distributions made to or for the account of such person.

**ARTICLE IX**
**MISCELLANEOUS**

      **Section 9.1**   **Amendments**. Amendments to this Agreement may be made only by an instrument in writing signed by all of the Members.

      **Section 9.2**   **Governing Law**. This Agreement shall be interpreted and enforced in accordance with the laws of the State of Mississippi.

      **Section 9.3**   **Notices**. Any notice, payment, demand, offer, or communication required or permitted to be given by any provision of this Agreement shall be deemed to have been delivered and given for all purposes (a) if delivered personally to the Member or to an officer of the Member to whom the same is directed at the address set forth in this Agreement, (b) whether or not the same is actually received, if sent by registered or certified mail, postage and charges prepaid, addressed to a Member, at the address set forth in Exhibit "A" to this Agreement, or (c) in all other cases, when actually received by the party to whom it is addressed. Any party may change the address to which said notices are to be given by giving written notice of such change to the other Members in the manner set forth herein.

      **Section 9.4**   **Captions**. Section titles or captions contained in this Agreement are for reference purposes only and shall not be construed to expand or limit any of the terms of this Agreement.

21

**Section 9.5    Variations of Pronouns.** All pronouns and any variations thereof shall be deemed to refer to the masculine, feminine, neuter, singular, or plural as the identity of the person or persons may require.

**Section 9.6    Severability.** Every provision of this Agreement is intended to be severable. If any term or provision hereof is illegal or invalid for any reason whatsoever, such illegality or invalidity shall not affect the validity of the remainder of this Agreement.

**Section 9.7    Counterpart Execution.** This Agreement may be executed in several counterparts with the same effect as if all parties hereto had signed the same document. All counterparts shall be construed together and shall constitute one agreement.

**Section 9.8    Waiver.** No consent or waiver, express or implied by any Member to or of any breach or default by the other in the performance by the other of its obligations hereunder shall be deemed or construed to be a consent or a waiver to or of any other breach or default in the performance by such other Member of the same or any other obligations of such Member hereunder. Failure on the part of any Member to complain of any act or failure to act of the other Member or to declare the other Member in default, irrespective of how long such failure continues, shall not constitute a waiver by such Member of its rights hereunder.

**Section 9.9    Binding Effect.** Subject to the restrictions on transfers and encumbrances set forth herein, this Agreement shall inure to the benefit of and be binding upon the undersigned Members and their respective heirs, executors, legal representatives, successors and assigns. Whenever, in this instrument, a reference to any Member is made, such reference shall be deemed to include a reference to the heirs, executors, legal representatives, and permitted assigns of such Member.

**Section 9.10    Benefits.** Except as herein otherwise provided to the contrary, this Agreement shall be binding upon and inure to the benefit of the parties signatory hereto, their personal representatives, heirs, successors and assigns.

**Section 9.11    Attorneys' Fees.** In the event the Members are required to engage the services of legal counsel to enforce their rights under this Agreement, regardless of whether such action results in an actual lawsuit being filed, the prevailing Member shall be entitled to reasonable attorneys' fees from the other Member. In the event of litigation, said attorneys' fees shall include fees and costs, including costs of paralegals, both at trial and appeal, including bankruptcy actions.

**Section 9.12    No Third Party Beneficiaries.** This Agreement is solely for the benefit of the Members. No person not a Member shall have any rights or privileges under this Agreement, either as a third-party beneficiary or otherwise.

**Section 9.13  Complete Agreement.**  This Agreement constitutes the entire understanding and agreement among the parties hereto and supersedes any prior understandings, whether written or oral, with respect to the subject matter hereof, and there are no agreements, understandings, restrictions, representations, or warranties among the parties other than those set forth herein or herein provided for.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date above written.

CLASS A MEMBER:

Jerry L. Wallace

CLASS B MEMBER:

SAMSARA INVESTMENTS III, LLC, a Delaware limited liability company

By: _____

Aditi Shah, Manager

23

Section 9.13  **Complete Agreement.**   This Agreement constitutes the entire understanding and agreement among the parties hereto and supersedes any prior understandings, whether written or oral, with respect to the subject matter hereof, and there are no agreements, understandings, restrictions, representations, or warranties among the parties other than those set forth herein or herein provided for.

**IN WITNESS WHEREOF,** the parties hereto have executed this Agreement as of the date above written.

CLASS A MEMBER:

_____
Jerry L. Wallace

CLASS B MEMBER:

SAMSARA INVESTMENTS III, LLC, a Delaware limited liability company

By: _____
Aditi Shah, Manager

23

**EXHIBIT A**

**INITIAL CAPITAL CONTRIBUTIONS**

| Member's Name and Address | Amount of Capital Contributed |
|---|---|
| Jerry L. Wallace<br>4458 Ocean View Drive<br>Destin, Florida 32541 | $100.00 |
| Samsara Investments III, LLC<br>1500 Lexington Avenue<br>Apt. 18C<br>New York, New York 10029 | $6,000,000.00 |

**EXHIBIT B**

**LAND**

(see attached)

EXHIBIT A

LEGAL DESCRIPTION OF THE LAND

A parcel of land situated in and being a part of Lots 9, 10, 11 and 12, of the L.A. Frederick
Survey, located in Fractional Section 35, Township 7 South, Range 10 West, City of Biloxi,
Second Judicial District of Harrison County, Mississippi, and being more particularly described
as follows:

BEGIN at an iron pipe found at the intersection of the east line of Lot 9 of the L. A. Frederick
Survey with the south line of the Paul M. Skrmetti's Greater Biloxi Subdivision;

Thence South 00 degrees 32 minutes 49 seconds East 385.46 feet along the east line of said Lot
9, and also the west line of the property recorded in Deed Book 258, Page 347, to an iron rod
found and the northeast corner of the property conveyed to DB Biloxi II, LLC, per Instrument
Number 2005-0006171-DJ2, on file in the office of the Chancery Clerk of the Second Judicial
District of Harrison County, Mississippi; thence South 89 degrees 44 minutes 30 seconds West
193.74 feet to an iron rod found at the northwest corner of the above mentioned DB Biloxi II,
LLC property and the west line of said Lot 9; thence South 00 degrees 15 minutes 45 seconds
East 589.31 feet along the West line of said Lot 9 and the DB Biloxi II, LLC property to a
chiseled mark found in a concrete drive and the northern margin of U.S. Highway 90; thence
South 79 degrees 44 minutes 15 seconds West 103.16 feet along said northern margin of U.S.
Highway 90 to an iron rod found at the northern edge of an existing concrete sidewalk; thence
South 76 degrees 18 minutes 32 seconds West 72.38 feet along said northern margin of U.S.
Highway 90 to a mag nail set in asphalt at the northern edge of existing concrete curbing; thence
South 81 degrees 59 minutes 08 seconds West 65.19 feet along said northern margin of U.S.
Highway 90 to an iron rod set at the northern edge of an existing concrete sidewalk; thence
South 79 degrees 47 minutes 08 seconds West 86.57 feet along said northern margin of U.S.
Highway 90 to an iron rod set at the northern margin of an existing concrete sidewalk; thence
South 80 degrees 24 minutes 15 seconds West 43.31 feet along said northern margin of U.S.
Highway 90 to an iron rod set at the northern edge of an existing concrete sidewalk; thence
South 76 degrees 25 minutes 45 seconds West 25.52 feet along said northern margin of U.S.
Highway 90 to a mag nail set in an existing concrete drive and the east line of the property
conveyed to Ronald C. Pierotich and J.J. Pierotich per Deed Book 238, Page 375, and the west
line of Lot 11 of the L.A. Frederick Survey; thence North 00 degrees 17 minutes 49 seconds
West 392.87 feet along said east line of Pierotich and the west line of said Lot 11 to an iron pipe
found at the northeast corner of said Pierotich property; thence South 89 degrees 47 minutes 59
seconds West 82.14 feet to a point in an existing palm tree at the northwest corner of said
Pierotich property, said point being witnessed by an iron rod set North 89 degrees 47 minutes 59
East 2.00 feet and an iron rod set North 00 degrees 17 minutes 10 seconds West 2.00 feet, said
point also lying on the east line of the property conveyed to A. Jake Mladinich, II, and wife, June
S. Mladinich per Deed Book 284, Page 531; thence North 00 degrees 17 minutes 10 seconds
West 652.79 feet along the east line of said Mladinich property to an iron pipe found on the
south line of the Paul M. Skrmetti's Greater Biloxi Subdivision and also the northeast corner of
said Mladinich property; thence North 89 degrees 44 minutes 20 seconds East 369.27 feet along
said south line of the Paul M. Skrmetti's Greater Biloxi Subdivision to an iron pipe found at the

northeast corner of the property conveyed to B & C Enterprises, Inc., per Deed Book 102, Page 370; thence North 88 degrees 56 minutes 05 seconds East 102.41 feet along said south line of the Paul M. Skrmetti's Greater Biloxi Subdivision to an iron pipe found at the intersection of the west line of Lot 9 of the L.A. Frederick Survey with the south line of said Paul M. Skrmetti's Subdivision; thence South 89 degrees 56 minutes 56 seconds East 192.24 feet along said south line of the Paul M. Skrmetti's Greater Biloxi Subdivision to the POINT OF BEGINNING.

Said parcel containing 11.979 acres, more or less, and being the property conveyed to B & C Enterprises, Inc., per Deed Book 102, Page 370, the property conveyed to DB Biloxi II, LLC, per Instrument Number 2005-0006171-DJ2, the property conveyed to C.C. Hamill and wife Marguerite V. Hamill per Deed Book 120, Page 96, the property conveyed to C.C. Hamill and wife Marguerite V. Hamill per Copy Book 120, Page 281, and the property conveyed to C.C. Hamill and wife Marguerite V. Hamill per Copy Book 122, Page 169, all on file in the office of the Chancery Clerk of the Second Judicial District of Harrison County, Mississippi.