# EXHIBIT F

COPY

1

1

2    UNITED STATES DISTRICT COURT

3    SOUTHERN DISTRICT OF NEW YORK

4    07 CIV. 9385 (JFK)

5    --------------------------------------x

6    SAMSARA INVESTMENT III, LLC,

7                    Plaintiff,

8            vs.

9    JERRY L. WALLACE,

10                   Defendant.

--------------------------------------x

11

12

                        May 12, 2008

13                      8:20 a.m.

14

15       Deposition of Jerry L. Wallace,

16    held at the offices of Haynes & Boone, LLP,

17    153 East 53rd Street, New York, New York,

18    pursuant to Court Order, before Francine

19    Sky, a Notary Public of the State of New

20    York.

21

22

23

24

25

162

1                    Jerry L. Wallace

2    as Managing Member, that you just sat back

3    there and did nothing?

4         A.    Nobody else was doing anything.  I

5    had no choice.

6         Q.    So you continued to act as Managing

7    Member?

8         A.    I had no choice.

9         Q.    The answer to my question is you

10   continued to act as Managing Member; correct?

11        A.    Yes.

12        Q.    And you did that on your own;

13   correct?

14        A.    Yes.

15        Q.    You're still acting, to the extent

16   you can, as Managing Member of Shores of

17   Paradise; correct?

18        A.    Yes.  A-ha.

19        Q.    That continues today?  If somebody

20   says, Who is the Managing Member, you are the

21   Managing Member, today?

22        A.    No, sir.

23        Q.    You are acting as Managing Member

24   today, sir, aren't you?

25        A.    I'm not acting as Managing Member.

163

Jerry L. Wallace

1   There's no activity and I have no authority to

2   do that other than to protect myself.

3   

4       Q.    Which you continue to do?

5       A.    I have to protect myself.  They're

6   not doing anything.

7       Q.    Directing your attention to the

8   second Counterclaim, it says -- Paragraph 26:

9   "Plaintiff" -- that is Samsara -- "failed to

10  discharge its duties as a manager in good

11  faith."

12          Do you see that?

13      A.    A-ha.

14      Q.    What is the basis for that

15  allegation?

16      A.    When you have a contract with

17  somebody, you have to perform on that

18  contract.  And their own contract that they

19  wrote and submitted to me to sign stated that

20  in the event that I defaulted they would come

21  in and take this over and handle it.

22          So they didn't act in good faith

23  because they didn't do that.

24      Q.    You're saying the basis of that

25  allegation is that they failed to come in and

164

1          Jerry L. Wallace

2    take over the project?

3          A.    Yes.

4          Q.    Mr. Wallace, didn't you ask to

5    continue to be in charge of that project?

6          A.    I didn't ask to do anything.

7    Because I was out of money.  I couldn't ask

8    anybody to do anything.

9          Q.    You couldn't ask anybody to do

10   anything.

11               So you couldn't ask Samsara to come

12   in as Managing Member?

13         A.    I mean, they already were the

14   Managing Member as far as the contract goes.

15         Q.    But in terms of what was happening,

16   Mr. Wallace, you were continuing to act as

17   Managing Member; correct?

18         A.    Say that again.

19               (The record was read.)

20         A.    Yes.

21         Q.    And with respect to your calls to

22   Mr. Shah, who is residing in India at the

23   time, you were calling him to request money;

24   correct?

25         A.    That's correct.

165

1    Jerry L. Wallace

2    Q.    That was the purpose of the call?

3    A.    That was the purpose, yes.

4    Q.    Were there any other purposes of

5    the call that you know of?

6    A.    At that time, the note was due.

7    That was why I called.

8    Q.    Aside from calling Mr. Shah to get

9    more money, was there any other purpose to

10    your calls to Mr. Shah that you know of as you

11    sit here today?

12    A.    No.

13    Q.    With respect to the third

14    Counterclaim:  "Plaintiff failed to discharge

15    its duty as a manager," reading from Paragraph

16    30, "with the care an ordinarily prudent

17    person in a like position would exercise under

18    similar circumstances."

19         Is the basis for that claim the

20    same basis you testified to as to Counterclaim

21    No. 2?

22    A.    Counterclaim No. 2?

23    Q.    Let me rephrase.

24         What is the basis of your third

25    Counterclaim?

166

Jerry L. Wallace

A.    The same one that I've just given about not coming in and managing the project and taking care of the debts.

Q.    Samsara, though, had no obligation to continue funding the project, did it?  It had no written obligation to give you more than the $6 million it initially invested, did it?

A.    No.  But they had -- I say no, because, I mean, I've got to reread the contract before I absolutely say, No, I don't think so.

Q.    Do you have any written agreement with Samsara beyond the initial Investment Agreement for $6 million?

A.    No others, no.

Q.    So they were obligated to give the first $6 million; correct?

A.    That's correct.

Q.    And with respect to the fourth Counterclaim, what's the basis of that Counterclaim?

A.    I guess that's the same as what we've just talked about.

210

Jerry L. Wallace

1

2      Q.      Mr. Wallace, we spoke a few moments

3  ago about the closing on the Samsara

4  transaction, that is, the signing of the

5  Guaranty, the Investment Agreement and the

6  Amended Operating Agreement for Shores of

7  Paradise, LLC.

8              You testified that at that time

9  your counsel from Greenberg Traurig had

10  reviewed it and indicated it was okay for you

11  to sign; correct?

12     A.      Yes.

13     Q.      You received that counseling prior

14  to signing; correct?

15     A.      Not during the signing and not on

16  the day that I signed.

17     Q.      Prior to signing it?

18     A.      Prior to the signing.

19     Q.      And do you recall being represented

20  by Jeff Hall at that closing?

21     A.      He didn't represent anyone.  Jeff

22  Hall -- he was not representing me.  He was

23  representing -- he was just the closing agent.

24     Q.      Who was paying for the closing

25  agent?

213

Jerry L. Wallace

Q.    I want to direct your attention to
the bottom where the attachments are
indicated.  Shores of Paradise, Amended and
Restated Operating Agreement, Version 7;
Shores of Paradise Guaranty of Jerry Wallace,
Version 4; Shores of Paradise Investment
Agreement, Version 6.

Do you see that?

A.    Yes.

Q.    Did you, in fact, under cover of
this e-mail, receive copies of those three
documents, the Amended and Restated Operating
Agreement, the Guaranty that you signed and
the Investment Agreement from Samsara?

A.    Yes.

Q.    Did you call with any questions
upon reviewing these documents?

A.    No.

Q.    Did you have any questions upon
reviewing these documents?

A.    No.  No.  I was depending on Edward
Heath.

Q.    You received them, you reviewed
them, and had no questions; correct?

214

Jerry L. Wallace

1    A.    No.  I'm only assuming I received

2    them.

3    Q.    You have no reason to believe you

4    didn't receive them?

5    A.    I have no reason.

6    Q.    Just so we have a clear record,

7    looking at Exhibit 13, as you sit here today,

8    you received each of the three documents, the

9    Amended and Restated Operating Agreement, the

10   Guaranty of Jerry Wallace and the Shores of

11   Paradise Investment Agreement, you reviewed

12   those documents and you had no questions for

13   your counsel after reviewing them; correct?

14   A.    No.  I haven't -- had none, no.

15   Q.    That's correct, in answer to my

16   question?

17   A.    Correct.  Correct.

18   Q.    At some point after you received

19   the three documents pertaining to the Shores

20   of Paradise transaction, and reviewed them,

21   you went to close on the deal; correct?

22   A.    Yes.

23   Q.    It was that day, February 23, 2006?

24   A.    I don't know what day we closed.

215

1          Jerry L. Wallace

2              (Plaintiff's Exhibit 14, E-mail

3      from Jason Simon to Jeff Dinerstein at

4      Haynes & Boone with a cc to Edward Heath,

5      Alan Sheppard, and Bruce Merwin, marked for

6      identification.)

7      Q.     I direct your attention to Exhibit

8  14.  That's an e-mail, again, from Jason

9  Simon, and that's to Jeff Dinerstein, I will

10  represent that's Samsara's counsel at Haynes &

11  Boone, with a cc to Edward Heath, Alan

12  Sheppard, and Bruce Merwin.  It says "executed

13  investment documents."

14              It says:  "Attached are copies of

15  the investment documents executed by Jerry

16  Wallace.  As discussed, the Investment

17  Agreement is to be held in escrow pending our

18  receipt of a copy signed by Samsara, and the

19  Amended and Restated Operating Agreement and

20  Guaranty are to be held in escrow pending our

21  confirmation of release, upon the occurrence

22  of the applicable triggering events set forth

23  in the Investment Agreement.  Let me know if

24  you have any questions.  Best regards, Jason."

25              So does this refresh your

216

Jerry L. Wallace

1  recollection, understanding you're not copied

2  on this, that at some point after you received

3  and reviewed the three documents you attended

4  a closing and signed the documents?

5  A.    Yes.

6  Q.    Do you recall if you had any

7  questions about the documents at the closing?

8  A.    No.

9  MR. PRESSMENT:    Exhibit 15.

10  (Plaintiff's Exhibit 15, Document

11  Bates stamped 208 through D 237, marked for

12  identification.)

13  Q.    This is the Amended and Restated

14  Operating Agreement of Shores of Paradise,

15  LLC.  It's Bates marked 208 through D 237.

16  You can review the whole thing if

17  you would like.  My question is very limited.

18  A.    No.  Go ahead.

19  Q.    Excuse me?

20  A.    I've already reviewed it.  Go

21  ahead.

22  Q.    Directing your attention to Page

23  23, that is your signature; correct?

24  A.    Yes.

217

Jerry L. Wallace

1

2   Q.    You signed this document; correct?

3   A.    Yes.

4   Q.    And you received counsel regarding

5   this document prior to signing this; correct?

6   A.    I believe I did.

7   Q.    And you reviewed this document

8   prior to signing it; correct?

9   A.    I think I did.

10  Q.    You understood this document prior

11  to signing it?

12  A.    Yes.

13  Q.    You didn't have any questions about

14  this document prior to signing it; correct?

15  A.    Correct.

16  Q.    You agreed to be bound by the

17  contents of this document; correct?

18  A.    Yes, that's correct.

19  Q.    I want to direct your attention to

20  Exhibit 16.

21        (Plaintiff's Exhibit 16, Copy of

22        the Investment Agreement, marked for

23        identification.)

24  Q.    Exhibit 16 is a copy of the

25  Investment Agreement and the Bates mark has

218

1                     Jerry L. Wallace

2      been cut off.  I will represent to you it's

3      been produced by both parties in this case and

4      was attached to the Complaint in this case.

5                  I want to direct your attention to

6      Page 11 of the Investment Agreement.  That is

7      your signature; correct?

8           A.     Yes.

9           Q.     It appears twice there?

10          A.     Yes.

11          Q.     Once as the President of Shores of

12     Paradise, LLC; correct?

13          A.     Yes.

14          Q.     And once in your individual

15     capacity; correct?

16          A.     Yes.

17          Q.     And you signed those?

18          A.     Yes.

19          Q.     And you reviewed this document

20     prior to signing them, didn't you?

21          A.     Yes.

22          Q.     You had legal counsel prior to

23     signing this document, didn't you?

24          A.     Yes.

25          Q.     You understood this document prior

219

Jerry L. Wallace

2    to signing it; correct?

3        A.    Yes.

4        Q.    You had no questions about this

5    agreement prior to signing it, did you?

6        A.    Not that I recall.

7        Q.    You understood and agreed to be

8    bound by the terms of this agreement when you

9    signed it; correct?

10       A.    Yes.

11             (Plaintiff's Exhibit 17, Principal

12       Guaranty, marked for identification.)

13       Q.    Exhibit 17, this is a multi-page

14   document.  Again, I will represent it's been

15   produced by both parties in this case.  It is

16   a copy of a document called Principal

17   Guaranty.

18             That is a copy of the Guaranty in

19   this case; correct?

20       A.    Yes.

21       Q.    And I want to turn to Page 13.

22   That is your signature; correct?

23       A.    Yes.

24       Q.    And you reviewed this document

25   prior to signing it; correct?

225

1            Jerry L. Wallace

2          A F T E R N O O N    S E S S I O N

3            (Time noted:  2:08 p.m.)

4

5    J E R R Y    L.    W A L L A C E,    resumed

6        and testified as follows:

7

8    EXAMINATION (Cont'd.)

9    BY MR. PRESSMENT:

10            MR. PRESSMENT:    Back on the

11    record.

12        Q.    Mr. Wallace, we're returning from a

13    break.  During the break did you have occasion

14    to review Exhibit 17, which was your Principal

15    Guaranty?

16        A.    I did.

17        Q.    Are you able to identify any

18    provision in the Principal Guaranty, Exhibit

19    17, that was not in the version sent to you by

20    Jason Simon under cover of Exhibit 13 of your

21    deposition here today --

22        A.    No.

23        Q.    -- for your execution?

24        A.    No.

25        Q.    So to your knowledge, the document

226

1                    Jerry L. Wallace

2      you signed was the document that was forwarded

3      to you by counsel; correct?

4           A.     Correct.

5           Q.     And you signed that willingly;

6      correct?

7           A.     Yes.

8           Q.     And agreed to be bound by its

9      provisions; correct?

10          A.     Yes.

11          Q.     And following the execution of the

12     Agreement and in connection with that, Samsara

13     invested $6 million in Shores of Paradise;

14     correct?

15          A.     Correct.

16          Q.     And for that investment, it was to

17     be entitled to a guaranteed return in

18     accordance with the terms of the Operating

19     Agreement; correct?

20          A.     Correct.

21          Q.     And you agreed to those terms;

22     correct?

23          A.     Correct.

24          Q.     And that is the Operating Agreement

25     that you signed and which is part of your

227

1                Jerry L. Wallace
2    deposition as Exhibit No. 15; correct?
3         A.    Yes.
4         Q.    Mr. Wallace, following the
5    execution of the Amended Operating Agreement,
6    what, if any, activities did you conduct in
7    connection with the Shores of Paradise
8    property?
9         A.    We -- let me think here.  We had
10   the sales there prior to Katrina.
11               Is this before or after Katrina,
12   please, somebody tell me?
13        Q.    It's after.
14        A.    After Katrina, okay.  Actually, we
15   had to wait to find out about the market and
16   about the bank that we were going to get a
17   construction loan with.  This was only a land
18   loan.
19               And we had, if I'm not mistaken, we
20   had American National Bank, I think, was the
21   construction lender, I think, and we were
22   waiting to see what was going to happen after
23   the aftermath of Katrina to determine what to
24   do.  We just cannot know what to do.
25               And that took time, so there really

258

Jerry L. Wallace

2    talk about it.  Let's chat next week so we

3    know what you have in mind."

4            Do you see that?

5        A.    Yeah.

6        Q.    Do you recall receiving that e-mail

7    from Mr. Shah?

8        A.    No.

9        Q.    The top e-mail of Exhibit 20 was

10   from you.

11       A.    I understand, but I don't

12   remember -- I don't recollect.

13       Q.    Well, let me finish my question.

14       A.    Okay.

15       Q.    The top e-mail, Exhibit 20, is from

16   you to Sachin Shah with a copy to Rodney Bell.

17   That's Rodney Bell's e-mail address, correct,

18   rlbell777@yahoo.com?

19       A.    Yes.

20       Q.    That states, as you write:  "I

21   would like to know that I would have a choice

22   at time of closing your loan that I can opt to

23   postpone the payoff until August 31, 2007, for

24   an additional $1 million as a balloon note."

25           Do you recall writing that?

259

Jerry L. Wallace

2    A.    No.  No.

3    Q.    Reading that, does that refresh

4  your recollection in any way that as of

5  January 4, 2007, the understanding between you

6  and Mr. Shah was that you would stay on as

7  Managing Member at least through August 31,

8  2007?

9    A.    By reading this, I mean, if I were

10  able to get a yes on a one million, I would

11  have to assume so.

12    Q.    But it was your desire, at least at

13  that point, as of January, to stay on as

14  Managing Member?

15    A.    Yeah.  I didn't want to lose my

16  project.

17    Q.    For a clean record, as of

18  January 4, 2007, you expressed a desire to

19  stay on as Managing Member through August 31,

20  2007; correct?

21    A.    Yes.

22    Q.    Directing your attention to Exhibit

23  21.

24        (Plaintiff's Exhibit 21, Multi-page

25        document Bates stamped SAM 3674 through

264

Jerry L. Wallace

2    you want tomorrow, Tuesday, at 9 a.m., CST."

3              You go on to write some more about

4    Fountains of Laketown.

5              Do you recall writing that e-mail

6    on or about January 15th?

7         A.    Yes.  A-ha.

8         Q.    Do you recall the group?

9         A.    That's that same group.

10        Q.    Do you recall writing that "I do

11   intend to develop both properties"?

12        A.    Yes.

13        Q.    When you said you intended to

14   develop, what did you mean by that?

15        A.    I intended to go forward.

16        Q.    It was your intention as of

17   January 15, 2007, to continue to manage both

18   properties, Caribbean Dream and Shores of

19   Paradise, as the developer and Managing

20   Member; correct?

21        A.    That's correct.

22        Q.    You had no intention at that point

23   of relinquishing the Managing Member role with

24   respect to either of those properties; right?

25        A.    No.  The main reason, I was making

265

1                    Jerry L. Wallace

2      the payments, I think, at that time.  So I had

3      room to move.

4                    (Plaintiff's Exhibit 22, Multi-page

5              document Bates stamped SAM 3680 through SAM

6              3682, marked for identification.)

7              Q.    Direct your attention to Exhibit

8      22.  It's a multi-page document Bates marked

9      SAM 3680 through SAM 3682.

10                    Again, it's a string of e-mails,

11      and I will tell you that the back two pages

12      are e-mails that we've already looked at.

13                    So I would like to direct your

14      attention to the second e-mail which is an

15      e-mail from Sachin Shah to you, with a cc

16      Edward Heath.  Subject:  "Re:  Conference

17      call."

18                    It says:  "Jerry, in preparation

19      for tomorrow's call, could I please get

20      written replies from you on the following

21      matters."

22              A.    I'm trying to find you.

23                    MR. SHAH:  Page 1.

24              A.    Okay.

25              Q.    Do you see where I'm reading from?

274

1              Jerry L. Wallace

2    14.   It says:  "If and to the extent the

3    company has not paid to the Class B member the

4    full amount of the Class B preferred return

5    described in Section 4.1(a) above on or before

6    February 26, 2007, then the remaining amount

7    of the Class B preferred payable to the Class

8    B member as of such date shall accrue simple

9    interest."

10              Do you see that?

11        A.    Yes.

12        Q.    As of the date you remember Exhibit

13   25, February 27th, Samsara's return on its

14   investment was already due; correct?

15        A.    Yes.

16        Q.    And at that time you continued on

17   as Managing Member of Shores of Paradise?

18        A.    Yes.

19        Q.    And you asked to restructure or

20   delay the payment of the Samsara loan?

21        A.    That's right.

22        Q.    And that's something you wanted to

23   do; correct?

24        A.    A-ha.

25        Q.    You wanted to stay on as Managing

275

Jerry L. Wallace

2  Member?

3      A.    A-ha.

4      Q.    And you wanted to extend the time

5  period to repay the loan?

6      A.    Yes.  And I was still making

7  payments.

8      Q.    And you spoke to Samsara about

9  that?

10     A.    Yes.

11     Q.    That was the understanding you had

12  as of February 27, 2007?

13     A.    Correct.

14     Q.    And the understanding as of that

15  date was that you would stay on as Managing

16  Member; correct?

17     A.    Yes.

18     Q.    And that was Managing Member of the

19  Shores of Paradise?

20     A.    That's correct.

21     Q.    And Exhibit 26, you'll see, is a

22  March 6, 2007, e-mail -- I'm sorry, letter

23  from Samsara Investments to you.  Bates mark

24  on this document is SAM 4911 to 4912.

25                (Plaintiff's Exhibit 26, Document

276

1              Jerry L. Wallace

2         Bates stamped SAM 4911 to 4912, marked for

3         identification.)

4         Q.    I ask that you review that

5    document.  Let me know when you have.

6              (Witness reviews document.)

7         A.    Okay.

8         Q.    I want to direct your attention to

9    the first paragraph.  It says:  "Dear Jerry,

10   Samsara Investments III, LLC, a Delaware

11   Limited Liability Company (the 'Company') is

12   in receipt of your letter dated February 27,

13   2007."

14             That's Exhibit 25 we just looked

15   at; correct?

16        A.    26.

17        Q.    25 is the letter that Mr. Shah

18   references in Exhibit 26; correct?

19        A.    Yes.

20        Q.    It says -- it continues:  "After

21   consideration of your offer, the Company would

22   like to make the following counteroffer in

23   exchange for granting Shores of Paradise, LLC,

24   a Mississippi Limited Liability Company (the

25   'Obligor') an extension to pay the Company all

277

<pre>
 1                    Jerry L. Wallace
 2      sums due under the Amended and Restated
 3      Operating Agreement of the obligor dated
 4      February 24, 2006, and your Principal Guaranty
 5      dated February 24, 2006."
 6               Do you see that?
 7          A.    Yes.
 8          Q.    I want to direct your attention to
 9      Point 1.  It says:  "The Company" -- that is
10      Samsara -- "will delay the election to become
11      the Managing Member under the Operating
12      Agreement until July 30, 2007."
13          A.    Yes.
14          Q.    That was your understanding as of
15      this date, March 6, 2007; correct?
16          A.    Yes.
17          Q.    It was your understanding that
18      Samsara would not become the Managing Member;
19      correct?
20          A.    That's right.
21          Q.    And that you would continue on as
22      the Managing Member?
23          A.    Right.
24          Q.    You would continue on until at
25      least July 30, 2007?
</pre>

278

Jerry L. Wallace

2    A.    Correct.

3    Q.    That was something you agreed to?

4    A.    Yes.

5    Q.    That was something you acted in

6    accordance with?

7    A.    Yes.

8    Q.    You continued to make decisions for

9    Shores of Paradise during that period;

10    correct?

11    A.    Say that again.

12    Q.    You continued to act as the

13    Managing Member during that period; correct?

14    A.    Yes.

15    Q.    I'm going to show you Exhibit 27.

16        (Plaintiff's Exhibit 27, Multi-page

17        document Bates stamped D 64 through D 79,

18        marked for identification.)

19    Q.    Exhibit 27 is a multi-page document

20    produced by you, D 64 through D 79.  It

21    attaches a Summons and Complaints by the Wink

22    Companies, LLC, with respect to the Shores of

23    Paradise.

24        What was the Wink Companies?

25    A.    I don't know.

280

1              Jerry L. Wallace

2    keep up with all the reservations and sales of

3    the Shores of Paradise.

4          Q.    Now, Mr. Wallace, I have a number

5    of documents here I will represent to you

6    referencing actions you were taking with

7    respect to the Shores of Paradise project

8    between April 1, 2007, all the way through

9    June 2007.

10              My question is:  During that period

11    of time you continued to act as the Managing

12    Member of Shores of Paradise; correct?

13          A.    Yes.

14          Q.    At that point in time, Samsara was

15    not the Managing Member; correct?

16          A.    That's correct.

17          Q.    You didn't ask them to be the

18    Managing Member during that period; correct?

19          A.    Not during that period.

20              MR. PRESSMENT:   Off the record.

21              (Discussion off the record.)

22              MR. PRESSMENT:   Why don't we take

23    a five-minute break.

24              (Recess taken.)

25              MR. PRESSMENT:   Back on the

281

1           Jerry L. Wallace

2    record.

3                (Plaintiff's Exhibit 28, Two-page

4           document Bates stamped SAM 3765 through

5           3766, marked for identification.)

6         Q.    Mr. Wallace, I'm handing you what

7    has been marked as Exhibit 28 for this

8    deposition.  It's a two-page document Bates

9    marked SAM 3765 through 3766.

10                I want to direct your attention

11   first to the e-mail from you, Jerry Wallace,

12   to Sachin Shah, at the bottom of the page,

13   continuing to Page 2, dated May 18, 2007.  If

14   you turn the page you'll see the date.  The

15   subject of that e-mail is "payoff," and you

16   write:  "Would your group take $9 million if

17   paid off in full by July 1st?"

18                Do you see that?

19        A.    A-ha.

20        Q.    Do you recall writing that to

21   Mr. Shah?

22        A.    Yeah, I think so.

23        Q.    Mr. Wallace, was it your

24   understanding as of this date, May 2007, that

25   in connection with this transaction, Samsara

282

1              Jerry L. Wallace

2    made an initial investment of $6 million,

3    which, pursuant to the Operating and

4    Investment Agreements and the Guaranty, they

5    were to get a return of 10.2 million by

6    February 26, 2007?

7         A.    Yes.

8         Q.    That was your understanding as to

9    the agreement?

10         A.    Yes.

11         Q.    Is that your understanding today as

12   to the agreement?

13         A.    Yes.

14         Q.    And Samsara made that $6 million;

15   correct?

16         A.    They did what?

17         Q.    They made that investment of $6

18   million; correct?

19         A.    Yes.

20         Q.    And it is your understanding, and

21   you would agree with me, that pursuant to the

22   terms of your agreement with Samsara, Samsara

23   is entitled to a return of $10.2 million on

24   that initial investment plus interest;

25   correct?

283

Jerry L. Wallace

2    A.    Yes.

3    Q.    And Samsara hasn't been paid a dime

4 towards that $10.2 million plus interest that

5 they're owed; correct?

6    A.    That's correct.

7    Q.    And you do not contest the fact

8 that Samsara is owed that money; correct?

9    A.    No.

10    Q.    The only thing you contend is that

11 you may not have the funds to be able to pay

12 them back; correct?

13    A.    That's a fact.

14    Q.    But that's the only thing.  You

15 don't contest the fact that Samsara is owed

16 that money; correct?

17    A.    I don't contest that they're owed

18 the money.

19    Q.    And with respect to your role as

20 Managing Member of Shores of Paradise, we

21 established that continued until at least July

22 or August of 2007; correct?

23    A.    That's correct.

24    Q.    And actually, it continued past

25 that, didn't it?

284

Jerry L. Wallace

A.    Well, yeah, out of necessity.

Q.    Well, in fact, you agreed that you would stay on as Managing Member of Shores of Paradise?

A.    I don't remember exactly when my last payment was with Kennedy.  If I knew the date I could answer your question better.  If I knew the date that he made his payment.

From that point on I needed to come in there and give me help.  It would minimize -- it could have minimized our losses.

Q.    In terms of your agreement with Samsara, you were in agreement that you would stay on as Managing Member of Shores of Paradise through at least July or August of 2007?

A.    That's correct.

Q.    And you acted in accordance with that agreement; correct?

A.    Yes.

Q.    And you didn't expect Samsara to assume the role of Managing Member?

A.    Not during that period, no.

Q.    I want to direct your attention to

285

1                   Jerry L. Wallace

2    this document.  It is a tax return form for

3    the year 2006.  You signed that first page on

4    behalf of Shores of Paradise, LLC, on or about

5    August 15, 2007; correct?

6                   (Plaintiff's Exhibit 29, 2006 IRS

7          Form 8879-PE, marked for identification.)

8          A.     That's correct.

9          Q.     As of that time, you were

10   continuing to serve as the Managing Member of

11   the Shores of Paradise, LLC; correct?

12         A.     A-ha.

13         Q.     You do not contend it was Samsara's

14   responsibility at that time to be the Managing

15   Member; correct?

16         A.     Not at that time.

17         Q.     Has Samsara filed a tax return for

18   the year 2007?

19         A.     I have no idea.

20         Q.     Do you know if it filed an

21   extension for the tax return for 2007?

22         A.     I don't know.

23         Q.     Who would know that?

24         A.     I don't know who would know that.

25   First of all, I don't have any money to pay an

289

                    Jerry L. Wallace

1

2    sitting there to just ignore it.  It wasn't

3    like I shut the door and walked out.

4         Q.    There's no agreement -- I guess my

5    question is this, Mr. Wallace, for clarity:

6              There's no piece of paper or

7    agreement you can point to where you

8    relinquish the role of Managing Member of

9    Shores of Paradise?

10        A.    No piece of paper, no.

11        Q.    And certainly at least through

12   August of 2007 you were continuing to act as

13   the Managing Member; correct?

14        A.    That's correct.

15        Q.    And this lawsuit was filed in

16   October of 2007; correct?

17        A.    I don't know.

18        Q.    Direct your attention to Exhibit

19   31, which is a copy of the Complaint filed in

20   this action.

21              This lawsuit was filed on or about

22   October 19, 2007; correct?

23              (Plaintiff's Exhibit 31, Copy of

24         Complaint, marked for identification.)

25        A.    It's either a 10 or 19.  I can't tell.

290

1                    Jerry L. Wallace

2        Q.    Directing your attention to the last

3  page.  October 19 --

4        A.    Okay, yeah.

5        Q.    -- 2007.

6        A.    Yeah, okay.

7        Q.    Does that refresh your recollection

8  that this lawsuit was filed on or about

9  October 19, 2007?

10       A.    Yes.  Yes.  Yes, it does.

11       Q.    Do you recall whether or not at the

12 time you received this lawsuit you were taking

13 any actions as Managing Member of Shores of

14 Paradise, LLC?

15       A.    I don't recall.

16       Q.    But you had not --

17       A.    I don't think -- I mean, they had

18 not made any move to come in to do any

19 management.

20       Q.    And you had not relinquished your

21 role --

22       A.    I mean, like I say, you couldn't

23 just shut the door and walk away.

24       Q.    In answer to my question, as of the

25 date this Complaint was filed you had not

291

Jerry L. Wallace

1  relinquished your role as the Managing Member

2

3  of Shores of Paradise, LLC; correct?

4      A.    Not in writing.  What I was trying

5  to do was to avoid this lawsuit.

6      Q.    But you had no agreement with

7  Samsara --

8      A.    No agreement, no.

9      Q.    Let me complete my question.

10         As of the date this lawsuit was

11  filed, you had no agreement with Samsara for

12  Samsara to assume the role of Managing Member?

13     A.    No.  Right, no.

14     Q.    And referring back to Exhibit 6,

15  then.  I want to direct your attention to your

16  Counterclaims in this action.  And the first

17  Counterclaim, directing your attention to the

18  same paragraph we looked at this morning,

19  Paragraph 21, are you able to state here with

20  any specificity any actions that Samsara

21  failed to take that it should have or was

22  obligated to pursuant to any agreement you had

23  with them as a Managing Member?

24     A.    I would have to say yes, that they

25  did not do what, in my opinion, would be the

292

Jerry L. Wallace

2   thing to do in their position.

3   Q.    That was a business perspective,

4   though; correct, sir?

5   A.    Not really.

6   Q.    Well, to your knowledge, just to

7   clarify in light of what you testified,

8   Samsara was not bound or legally obligated

9   pursuant to any agreement you know of --

10  A.    Yeah, they were legally obligated.

11  They chose to forebear on that agreement.

12  Q.    And you agreed to forebear, yes?

13  A.    I agreed to that, but whenever I

14  ran out of being able to make the payments

15  then I could not do anything else.

16  Q.    And you can't tell us whether or

17  not that was before or after the Complaint --

18  A.    All you have to do is tell me when

19  he made his payment.

20  Q.    Quite frankly, I don't know, sir.

21  The question is:  As you sit here today, you

22  can't tell me whether or not you requested

23  that Samsara assume the role of Managing

24  Member before the Complaint was filed in this

25  case?

293

Jerry L. Wallace

A.    I have to say that I was begging for help.

Q.    Help?

A.    Please help.

Q.    Sure.  Mr. Wallace, understand that I'm asking specific questions about the claim being a Managing Member.

A.    I understand.

Q.    As of the date of the Complaint, October 19, 2007, you can't tell me today that you were not still the Managing Member of Shores of Paradise; correct?

A.    No.  Because they had not stepped in to do that.

Q.    So as of that date you were still acting as the Managing Member of Shores of Paradise; correct?

A.    Yes.

Q.    And that was something you agreed to do?

A.    That was something I had to do.  I had no choice.

Q.    And you agreed to do that in your communications with Samsara; correct?

294

1                   Jerry L. Wallace

2          A.      I had no choice.

3          Q.      Sir, my question was:  That was

4     something you agreed to do; correct?

5          A.      Yes.

6                   MR. PRESSMENT:  I am going to look

7     over just the documents you gave me to copy

8     and make sure.  If there's nothing I haven't

9     seen before I will be ready to finish up.

10    Give me a few moments.  We'll go off the

11    record.

12                   Just note for the record that

13    Mr. Wallace has produced to me today a pile of

14    documents that he represents is part of his

15    file regarding the Shores of Paradise project.

16                   So the documents I'm referring to

17    now are those documents.  I will take a few

18    moments to review them, and if anything I need

19    to follow up on on those documents appears to

20    me, I will do so shortly after the break.

21         A.      Okay.

22                   (Recess taken.)

23         Q.      I'm going to direct your attention

24    to Exhibit 32.

25                   (Plaintiff's Exhibit 32, Multi-page

302

1

2                    C E R T I F I C A T E

3

4    STATE OF NEW YORK      )

5                              : ss.

6    COUNTY OF NEW YORK      )

7

8              I, FRANCINE SKY, a Shorthand

9         Reporter and Notary Public within and for

10        the State of New York, do hereby certify:

11             That JERRY L. WALLACE, the witness

12        whose deposition is hereinbefore set forth,

13        was duly sworn by me and that such

14        deposition is a true record of the

15        testimony given by the witness.

16             I further certify that I am not

17        related to any of the parties to this action

18        by blood or marriage, and that I am in no

19        way interested in the outcome of this

20        matter.

21             IN WITNESS WHEREOF, I have hereunto

22        set my hand this 23rd day of May, 2008.

23

24

25                              FRANCINE SKY