# EXHIBIT C

## INVESTMENT AGREEMENT

This Investment Agreement, dated as of February 23, 2006 (this "*Agreement*"), is entered into by and among Shores of Paradise, LLC, a Mississippi limited liability company (the "*Company*"), Jerry L. Wallace, a resident of the State of Florida ("*Wallace*"), and Samsara Investments III, LLC, a Delaware limited liability company (the "*Investor*"). The Company, Wallace and the Investor are sometimes referred to herein individually as a "*Party*," and collectively as the "*Parties*."

### RECITALS

WHEREAS, the Company has the right to purchase three parcels of real property located in Biloxi, Mississippi; and

WHEREAS, the Investor desires to provide financing to permit the Company to purchase two of such parcels, on the terms and subject to the conditions set forth in this Agreement.

### AGREEMENT

NOW, THEREFORE, in consideration of the premises and the mutual covenants contained in this Agreement and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, and intending to be legally bound, the Parties agree as follows:

### ARTICLE I
### DEFINITIONS

1.1     Definitions.  When used in this Agreement, the following capitalized terms shall have the meanings set forth below:

"*Acquisition Loan*" shall mean one or more loans to be obtained by the Company for the purpose of financing and/or refinancing the acquisition of the Property (or any portion thereof).

"*Amended and Restated Operating Agreement*" shall mean an Amended and Restated Operating Agreement of the Company in the form of Exhibit A attached hereto.

"*Bossier-Disotell Property*" shall mean the real property legally described on Exhibit B attached hereto.

"*DB Biloxi Property*" shall mean the real property legally described on Exhibit C attached hereto.

"*Closing Date*" shall mean the date, if any, on which the Investor becomes a Class B member of the Company pursuant to the provisions of Article II hereof.

"*Guaranty*" shall mean a Principal Guaranty in the form of Exhibit D attached hereto.

"*Investment Amount*" shall mean $6,000,000.

"*Investment Date*" shall mean the date on which the Company acquires the Bossier-Disotell Property.

"*Ms. Hamill Property*" shall mean the real property legally described on Exhibit E attached hereto.

"*Person*" shall mean any individual, corporation, trust, partnership, limited liability company or partnership, joint venture, unincorporated organization, governmental authority or any agency or political subdivision thereof, or other entity.

"*Property*" shall mean the Bossier-Disotell Property, DB Biloxi Property, and Ms. Hamill Property, collectively.

"*Purchase Agreements*" shall mean, collectively, the following agreements pursuant to which the Company has the right to purchase the DB Biloxi Property and the Ms. Hamill Property, respectively: (i) Purchase and Sale Agreement by and between DB Biloxi II, LLC, a Florida limited liability company, as Seller, and the Company, as Buyer, dated February 9, 2005, as amended by that certain First Amendment to Purchase and Sale Agreement dated July 7, 2005, that certain Second Amendment to Purchase and Sale Agreement dated October 11, 2005, and that certain Third Amendment to Purchase and Sale Agreement dated January 26, 2006; and (ii) Commercial Purchase and Sale Agreement dated February 23, 2005, by and between Marguerite V. Hamill, as Seller, and Rich Mountain Financial Consultants, Inc., a Texas corporation, as Buyer, as amended by that certain First Amendment to Commercial Purchase and Sale Agreement dated October 13, 2005, that certain Second Amendment to Commercial Purchase and Sale Agreement dated January 23, 2006, and by that certain Third Amendment to Commercial Purchase and Sale Agreement dated February 20, 2006.

"*Repayment Date*" shall mean February 26, 2007.

"*Securities Act*" shall mean the Securities Act of 1933, as amended.

Other terms defined herein have the meanings so given them.

## ARTICLE II
## THE INVESTMENT

2.1    Purchase of the Bossier-Disotell Property by the Company.  If the Investment Date occurs on or before February 24, 2006, then, on such date:

(a)    The Investor shall purchase from the Company, and the Company shall sell and issue to the Investor, 100% of the Class B membership interests in the Company (the "*Class B Interests*"), for an aggregate purchase price equal to the Investment Amount, payable by wire transfer of immediately available funds to such account or accounts as may be designated by the Company.  Upon such payment, Wallace and the Investor shall execute and deliver the Amended and Restated Operating Agreement, and the Investor shall become a Class B member of the Company, and shall be entitled to the rights and benefits, and subject to the obligations, set forth therein.

     (b)   Wallace shall execute and deliver the Guaranty to the Investor.

2.2   <u>Purchase of the Bossier-Disotell Property by the Investor</u>.  If the Investment Date shall not have occurred by February 24, 2006, then:

     (a)   On February 24, 2006, the Company shall assign to the Investor the Company's rights under the Purchase Agreements to purchase the DB Biloxi Property and the Ms. Hamill Property, and the Investor shall purchase such properties, in accordance with the terms contained in the Purchase Agreements.

     (b)   On the date that the Company acquires the Bossier-Disotell Property and closes the Acquisition Loan, (i) the Investor shall assign, transfer and convey the DB Biloxi Property and the Ms. Hamill Property to the Company, free and clear of all liens, claims and encumbrances, (ii) the Company shall issue to the Investor, in consideration therefor, the Class B Interests, (iii) Wallace and the Investor shall execute and deliver the Amended and Restated Operating Agreement, and the Investor shall become a Class B Member of the Company, and shall be entitled to the rights and benefits, and subject to the obligations, set forth therein, and (iv) Wallace shall execute and deliver the Guaranty to the Investor.

     (c)   Notwithstanding subsection (b) of this Section 2.2, if the Investment Date shall not have occurred prior to the Repayment Date, then (i) the Investor shall have no obligation to invest in the Company, and the Company shall have no obligation to issue the Class B Interests to the Investor, and (ii) the Investor shall have the right, exercisable by providing written notice thereof to the Company (the *"Purchase Notice"*) at any time during the 30-day period following the Repayment Date, to require the Company to purchase the DB Biloxi Property and the Ms. Hamill Property from the Investor.  If the Investor duly exercises the Purchase Notice, then the Investor shall sell, assign, transfer and convey to the Company, and the Company shall purchase from the Investor, the DB Biloxi Property and the Ms. Hamill Property, free and clear of any liens, claims and encumbrances, other than the encumbrances to the Seller's title to be listed in the owner's title policies to be issued in connection with the purchase of such properties, for an aggregate purchase price of $10,200,000.00 on a date mutually agreeable to the Company and the Investor, but in any event within 30 days following delivery of the Purchase Notice.  Prior to the Repayment Date, the Investor shall not sell, assign, transfer or convey the DB Biloxi Property or the Ms. Hamill Property (other than to the Company in accordance with the terms of this Section 2.2).  If the Investor does not duly exercise the Purchase Notice during the 30-day period following the Repayment Date, then the Investor shall thereafter have the right to hold, transfer, assign, sell and/or otherwise deal with the DB Biloxi Property and the Ms. Hamill Property as it sees fit.  The sooner to occur of (1) the date on which the Company purchases the DB Biloxi Property and the Ms. Hamill Property from the Investor pursuant to this subsection (c) and (2) the date on which the 30-day period following the Repayment Date lapses with the Investor not having delivered the Purchase notice during that period shall be referred to herein as the *"Termination Date."*

     (d)   In the event of any transfer of the DB Biloxi Property and/or the Ms. Hamill Property from the Investor to the Company pursuant to this Section 2.2, the Investor shall execute and deliver all such documents as may be necessary or appropriate to evidence and record such assignment, transfer and conveyance, free and clear of all liens, claims and

encumbrances, other than the encumbrances to the Seller's title to be listed in the owner's title policies to be issued in connection with the purchase of such properties, each in form and substance reasonably satisfactory to the Company.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF THE COMPANY

The Company hereby represents and warrants to the Investor, as of the date hereof and as of the Closing Date, as follows:

3.1   Organization, Qualification and Power.  The Company is a duly organized and validly existing limited liability company and is in good standing under the laws of the State of Mississippi and has all requisite limited liability company power and authority for the ownership and operation of its properties and for the carrying on of its business as now conducted and as now proposed to be conducted.  The Company has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

3.2   Authorization of Agreements.

(a)   The execution and delivery by the Company of this Agreement and the performance by the Company of its obligations hereunder have been duly authorized by all requisite action and will not (i) violate (A) any provision of any applicable law, or any order of any court or other agency of government applicable to the Company, (B) the Articles of Organization of the Company, (C) the Operating Declaration of the Company, or (D) any provision of any mortgage, lease, indenture, agreement or other instrument to which the Company or any of its properties or assets is bound, or (ii) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the properties or assets of the Company.

(b)   The Class B Interests have been duly authorized and, if and when issued and sold in accordance with this Agreement for the consideration expressed herein, will be validly issued, fully paid and nonassessable and will be free and clear of all liens, charges and encumbrances of any nature whatsoever and any restrictions on transfer except for restrictions on transfer under the Amended and Restated Operating Agreement and under applicable Federal and state securities laws.  The issuance and sale of the Class B Interests is not subject to any preemptive rights of members of the Company, or to any right of first refusal or other right in favor of any Person.

3.3   Validity.  This Agreement has been duly executed and delivered by the Company and constitutes the legal, valid and binding obligation of the Company, enforceable in accordance with its terms except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally; and (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.  The Amended and Restated Operating Agreement, if and when executed and delivered in accordance with this Agreement, will constitute the legal, valid and binding obligation of the Company, enforceable in accordance

with its terms except (i) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, and (ii) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

     3.4    <u>Capitalization; Membership Interests</u>.

     (a)    As of the date of this Agreement, Wallace owns 100% of the membership interests of the Company. As of the Closing Date, assuming the closing of the transactions contemplated hereby, the interests of the Company will be owned by the members and in the numbers set forth on <u>Schedule I</u> attached hereto.

     (b)    As of the date of this Agreement, (i) no Person other than Wallace owns of record or beneficially any interests of the Company, (ii) other than this Agreement, no subscription, warrant, option, convertible security or other right (contingent or other) to purchase or otherwise acquire from the Company (or, to the knowledge of the members of the Company, from any other person or entity) any interests of the Company is authorized or outstanding, and (iii) there are no additional commitments by the Company to issue interests, subscriptions, warrants, options, convertible securities or other such rights or to distribute to holders of any of its interests any evidence of indebtedness or assets.

     (c)    Except as provided for in this Agreement, the Company has no obligation (contingent or other) to purchase, redeem or otherwise acquire any of its interests or any interest therein or to make any distribution in respect thereof.

     (d)    Except for this Agreement and the Amended and Restated Operating Agreement, there are no voting trusts, proxies or other member agreements, pledge agreements, buy-sell agreements, rights of first refusal, preemptive rights (statutory or contractual) or other restrictions on the transfer of any interests of the Company (whether or not the Company is a party thereto).

     (e)    As of the date of this Agreement, Wallace has invested at least the sum of $1,000,000.00 in the Company in the form of payments toward the Property and services related to the development of the Property (the "*Wallace Minimum Investment*").

     3.5    <u>Compliance with Laws</u>. The Company is in compliance, in all material respects, with all requirements of law and governmental regulation. The Company has all licenses, permits, orders and approvals of any governmental agency or authority (collectively, "*Permits*") that are necessary for the conduct of the business of the Company, such Permits are in full force and effect, and no violations are or have been recorded in respect of any Permit.

     3.6    <u>No Brokers or Finders</u>. No Person has or will have, as a result of the transactions contemplated by this Agreement, any right, interest or valid claim against or upon the Company for any commission, fee or other compensation as a finder or broker arising out of the transactions contemplated by this Agreement.

     3.7    <u>Single-Purpose Entity</u>. The Company has been formed solely to acquire, develop, market, lease and sell the Property, and has not engaged in any other activities.

## ARTICLE IV
## REPRESENTATIONS AND WARRANTIES OF THE INVESTOR

The Investor represents and warrants to the Company, as of the date hereof and as of the Closing Date, as follows:

4.1    Organization, Qualification and Power.    The Investor is a duly organized and validly existing limited liability company and is in good standing under the laws of the State of Delaware and has all requisite limited liability company power and authority for the ownership and operation of its properties and for the carrying on of its business as now conducted and as now proposed to be conducted.    The Investor has all requisite power and authority to execute and deliver this Agreement and to perform its obligations hereunder.

4.2    Authorization of Agreements.

The execution and delivery by the Investor of this Agreement and the performance by the Investor of its obligations hereunder have been duly authorized by all requisite action and will not (a) violate (i) any provision of any applicable law, or any order of any court or other agency of government applicable to the Investor, (ii) the Certificate of Formation of the Investor, (iii) the Limited Liability Company Agreement of the Investor, or (iv) any provision of any mortgage, lease, indenture, agreement or other instrument to which the Investor or any of its properties or assets is bound, or (b) conflict with, result in a breach of or constitute (with due notice or lapse of time or both) a default under any such indenture, agreement or other instrument, or result in the creation or imposition of any lien, charge or encumbrance of any nature whatsoever upon any of the properties or assets of the Investor.

4.3    Validity.    This Agreement has been duly executed and delivered by the Investor and constitutes the legal, valid and binding obligation of the Investor, enforceable in accordance with its terms except (a) as limited by applicable bankruptcy, insolvency, reorganization, moratorium, and other laws of general application affecting enforcement of creditors' rights generally, and (b) as limited by laws relating to the availability of specific performance, injunctive relief, or other equitable remedies.

4.4    No Brokers or Finders.    Other than contemplated by the Limited Liability Company Agreement of the Investor, no Person has or will have, as a result of the transactions contemplated by this Agreement, any right, interest or valid claim against or upon the Investor for any commission, fee or other compensation as a finder or broker arising out of the transactions contemplated by this Agreement.

4.5    Accredited Investor.

(a)    the Investor is an "accredited investor" within the meaning of Rule 501 of Regulation D under the Securities Act or comply with Regulation S of the Securities Act;

(b)    the Investor has sufficient knowledge and experience in investing in companies similar to the Company in terms of the Company's stage of development so as to be able to evaluate the risks and merits of its investment in the Company and the Investor is able financially to bear the risks thereof;

(c)     the Class B Interests being purchased by the Investor are being acquired for the Investor's own account for the purpose of investment and not with a view to or for sale in connection with any distribution thereof;

(d)     the Investor understands that (i) the Class B Interests have not been registered under the Securities Act by reason of their issuance in a transaction exempt from the registration requirements of the Securities Act pursuant to Section 4(2) thereof or Rule 505 or 506 promulgated under the Securities Act, (ii) the Class B Interests must be held indefinitely unless a subsequent disposition thereof is registered under the Securities Act or is exempt from such registration, (iii) if certificated, the Class B Interests will bear a legend to such effect, and (iv) if certificated, the Company will make a notation on its transfer books to such effect; and

(e)     the Investor believes that it has received all the information that the Investor considers necessary or appropriate for deciding whether to purchase the Class B Interests, and that the Investor has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the offering of the Class B Interests and the business, properties, prospects and financial condition of the Company and to obtain additional information (to the extent the Company possessed such information or could acquire it without unreasonable effort or expense) necessary to verify the accuracy of any information furnished to the Investor or to which the Investor had access; provided, however, that the foregoing does not limit or modify the representations and warranties of the Company in Article III of this Agreement or the right of the Investor to rely thereon.

## ARTICLE V
## MISCELLANEOUS

5.1     _Insurance_.  The Company covenants and agrees with the Investor that, so long as the Investor owns any Class B Interests, the Company shall maintain the following insurance coverage with respect to any real property owned by it:  (a) fire and casualty insurance on any improvements on any real property owned by it, which are not contemplated for demolition, in an amount equal to the full replacement value of such improvements, and (b) commercial general liability insurance (_"CGL policy"_) on an occurrence basis in the amount of $1,000,000 per occurrence, and $2,000,000 in the aggregate, covering the Company against claims for bodily injury, death and property damage arising out of or in connection with the possession, use, operation, or maintenance of the property or such improvements as are located thereon.  The investor shall be named as an additional insured with respect to the CGL policy and the CGL policy shall provide a waiver of subrogation endorsement in favor of the Investor.

5.2     _Brokerage_.  Each Party hereto will indemnify and hold harmless the others against and in respect of any claim for brokerage or other commissions relative to this Agreement or to the transactions contemplated hereby, based in any way on agreements, arrangements or understandings made or claimed to have been made by such party with any third party.

5.3     _Parties in Interest_.  All representations, covenants and agreements contained in this Agreement by or on behalf of any of the parties hereto shall bind and inure to the benefit of the respective successors and permitted assigns of the parties hereto whether so expressed or not.

5.4    Notices.    All notices, requests, consents, demands, and other communications under this Agreement shall be in writing and shall be deemed to have been duly given on the date of service if served personally on the party to whom notice is to be given, on the date of transmittal of services via telecopy to the party to whom notice is to be given (with a confirming copy delivered within 24 hours thereafter), or on the third day after mailing if mailed to the party to whom notice is to be given, by first class mail, registered or certified, postage prepaid, or overnight mail via a nationally recognized courier providing a receipt for delivery and properly addressed as follows:

If to the Company or Wallace:

Jerry L. Wallace
4458 Ocean View Drive
Destin, FL 32541
Fax:    _____

with a copy to:

Greenberg Traurig, P.A.
450 South Orange Avenue, Suite 650
Orlando, FL 32801
Attn:    Alan C. Sheppard, Jr., Esq.
Fax:    (407) 650-8487

If to the Investor:

Samsara Investments III, LLC
1500 Lexington Avenue, Apt. 18C
New York, NY  10029
Attn:  Aditi Shah
Fax:    212.369.3629

with a copy to:

Haynes and Boone, LLP
1221 McKinney Street, Suite 2100
Houston, TX 77010
Attn:  Mr. Bruce Merwin
Fax:  (713) 236-5463

Any party may change its address for purposes of this paragraph by giving notice of the new address to each of the other parties in the manner set forth above.

5.5    Governing Law.    This Agreement shall be governed by and construed in accordance with the laws of the State of New York for all purposes and in all respects, without regard to the conflict of law provisions of such state.

5.6   Entire Agreement.  This Agreement, including the Exhibits, Schedules and related agreements attached as exhibits hereto, constitutes the sole and entire agreement of the parties with respect to the subject matter hereof.  All Exhibits and Schedules hereto are hereby incorporated herein by reference.

5.7   Counterparts.  This Agreement may be executed in two or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument.

5.8   Amendments and Waivers.  This Agreement may be amended or modified, and provisions hereof may be waived, with the written consent of the Company and the Manager of Investor.  Any such amendment, modification or waiver shall be binding on all parties, including those not signing such amendment, modification or waiver, and such consent may be given or withheld for any reason or for no reason.

5.9   Severability.  If any provision of this Agreement shall be declared void or unenforceable by any judicial or administrative authority, the validity of any other provision and of the entire Agreement shall not be affected thereby.

5.10   Titles and Subtitles.  The titles and subtitles used in this Agreement are for convenience only and are not to be considered in construing or interpreting any term or provision of this Agreement.

5.11   Indemnification.  The Company shall indemnify and defend the Investor against, and hold it harmless from, any loss, damage, expense (including reasonable attorney's fees), liability or claim incurred by the Investor by reason of any (i) breach or violation of any representation, warranty, covenant or agreement of the Company contained in this Agreement or (ii) act or omission of the Company with respect to its ownership or development of the Property, including, without limitation, any claims asserted by third parties for personal injuries, death or property damage.  The Investor shall indemnify and defend the Company against, and hold it harmless from, any loss, damage, liability, expense (including reasonable attorneys' fees) or claim incurred by the Company by reason of any (i) breach or violation of any representation, warranty, covenant or agreement of the Investor contained in this Agreement or (ii) act or omission of the Investor with respect to its ownership or development of the Property, including, without limitation, any claims asserted by third parties for personal injuries, death or property damage.

ARTICLE VI
SPECIFIC UNDERTAKINGS OF THE COMPANY

6.1   Expenses.  The Company specifically shall undertake to pay (a) all standard closing costs of the Investor associated with its acquisition, if applicable, of the DB Biloxi Property and the Ms. Hamill Property, and (b) the reasonable attorneys' fees (not to exceed $30,000 in the aggregate) of the Investor associated with its investment in the Company; provided, however, that the Company shall not be required to pay more than $50,000 in the aggregate pursuant to this Section 6.1.

6.2    <u>Covenants</u>. Commencing on the date hereof and continuing until the first to occur of (i) the date on which the Investor's Class B membership interest in the Company terminates in accordance with the terms of the Amended and Restated Operating Agreement and (ii) the Termination Date:

(a)    The Company shall issue the Class B Interests only to the Investor;

(b)    Wallace will maintain the Wallace Minimum Investment in the Company;

(c)    The Company will not engage in any activities other than the acquisition, development, marketing, leasing and sale of the Property without the express written consent of the Investor; and

(d)    The Company will not voluntarily create any inferior liens to encumber all or any portion of the Property, without the prior written consent of the Investor

[SIGNATURE PAGE FOLLOWS]

In Witness Whereof, the Company, Wallace and the Investor have executed this Agreement as of the date first above written.

THE COMPANY:

Shores of Paradise, LLC, a Mississippi limited liability company

By _Jerry L Wallace_
Name: Jerry L. Wallace
Title:  President

JERRY WALLACE:

_Jerry L Wallace_
Jerry L. Wallace

THE INVESTOR:

Samsara Investments III, LLC, a Delaware limited liability company

By _____
Name: Aditi Shah
Title:  Manager

In Witness Whereof, the Company, Wallace and the Investor have executed this Agreement as of the date first above written.

THE COMPANY:

Shores of Paradise, LLC, a Mississippi limited liability company

By_____
Name: Jerry L. Wallace
Title:  President

JERRY WALLACE:

_____
Jerry L. Wallace

THE INVESTOR:

Samsara Investments III, LLC, a Delaware limited liability company

By_____
Name: Aditi Shah
Title:  Manager

SCHEDULE I

MEMBERSHIP INTERESTS

Jerry L. Wallace -- 100% of the Class A membership interests

Samsara Investments III, LLC -- 100% of the Class B membership interests

I

**EXHIBIT A**

FORM OF AMENDED AND RESTATED OPERATING AGREEMENT

**EXHIBIT B**

**BOSSIER-DISOTELL PROPERTY**

EXHIBIT B

LEGAL DESCRIPTION OF BOSSIER PARCEL

A PARCEL OF LAND SITUATED IN AND BEING A PART OF LOTS 10, 11 AND
12, OF THE L.A. FREDERICK SURVEY, LOCATED IN FRACTIONAL SECTION
35, TOWNSHIP 7 SOUTH, RANGE 10 WEST, CITY OF BILOXI, SECOND
JUDICIAL DISTRICT OF HARRISON COUNTY, MISSISSIPPI, AND BEING MORE
PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE at an iron pipe found at the intersection of the east line of Lot 9 of the L.
A. Frederick Survey with the south line of the Paul M. Skrmetti's Greater Biloxi
Subdivision;
Thence North 89 degrees 56 minutes 56 seconds West 192.24 feet along the south line of
said Greater Biloxi Subdivision, and also the north line of the property conveyed to DB
Biloxi II, LLC, per Instrument Number 2005-0006171-DJ2, to an iron pipe found; thence
South 88 degrees 56 minutes 24 seconds West 102.40 feet to an iron rod found at the
northeast corner of the property conveyed to B & C Enterprises, Inc., per Deed Book 102,
Page 370 and the POINT OF BEGINNING of the property herein described;

Thence South 00 degrees 19 minutes 56 seconds East 992.29 feet along the West line of
said D.B. Biloxi, II, L.L.C. property, to an iron rod found at the north edge of an existing
concrete sidewalk and the northern margin of U.S. Highway 90; thence South 76 degrees
18 minutes 32 seconds West 72.38 feet along said northern margin of U.S. Highway 90 to
a mag nail set in asphalt at the northern edge of existing concrete curbing; thence South
81 degrees 59 minutes 08 seconds West 65.19 feet along said northern margin of U.S.
Highway 90 to an iron rod set at the northern edge of an existing concrete sidewalk;
thence South 79 degrees 47 minutes 08 seconds West 86.57 feet along said northern
margin of U.S. Highway 90 to an iron rod set at the northern edge of an existing concrete
sidewalk; thence South 79 degrees 47 minutes 08 seconds West 86.57 feet along said
northern margin of U.S. Highway 90 to an iron rod set at the northern edge of an existing
concrete sidewalk; thence South 80 degrees 24 minutes 15 seconds West 43.31 feet along
said northern margin of U.S. Highway 90 to an iron rod set at the northern edge of an
existing concrete sidewalk; thence South 76 degrees 25 minutes 45 seconds West 25.52
feet along said northern margin of U.S. Highway 90 to a mag nail set in an existing
concrete drive and the east line of the property conveyed to Ronald C. Pierotich and J.J.
Pierotich per Deed Book 238, Page 375; thence North 00 degrees 17 minutes 49 seconds
West 1045.76 feet along said east line of Pierotich and the east line of the property
conveyed to C.C. Hamill and wife Marguerite V. Hamill per Deed Book 122, Page 169,
and an iron rod set on the south line of said Paul M. Skrmetti's Greater Biloxi
Subdivision; thence North 89 degrees 44 minutes 20 seconds East 287.25 feet along said
south line of Paul M. Skrmetti's Greater Biloxi Subdivision to an iron pipe found at the
northeast corner of the property conveyed to B & C Enterprises, Inc., per Deed Book 102,
Page 370 and the POINT OF BEGINNING.

Said parcel containing 6.732 acres, more or less, and being the same property conveyed to B & C Enterprises, Inc., per Deed Book 102, Page 370, on file in the office of the Chancery Clerk of the Second Judicial District of Harrison County, Mississippi.

EXHIBIT C

DB BILOXI PROPERTY

EXHIBIT D


<u>LEGAL DESCRIPTION OF DB BILOXI PARCEL</u>

A parcel of land situated in and being a part of Lots 9, and 10, of the L.A. Frederick Survey, located in Fractional Section 35, Township 7 South, Range 10 West, City of Biloxi, Second Judicial District of Harrison County, Mississippi, and being more particularly described as follows:


BEGIN at an iron pipe found at the intersection of the east line of Lot 9 of the L. A. Frederick Survey with the south line of the Paul M. Skrmetti's Greater Biloxi Subdivision;
Thence South 00 degrees 32 minutes 49 seconds East 385.46 feet along the east line of said Lot 9, and also the west line of the property recorded in Deed Book 258, Page 347, to an iron rod found and the northeast corner of the property conveyed to DB Biloxi II, LLC, per Instrument Number 2005-0006171-DJ2, on file in the office of the Chancery Clerk of the Second Judicial District of Harrison County, Mississippi; thence South 89 degrees 44 minutes 30 seconds West 193.74 feet to an iron rod found at the northwest corner of the above mentioned DB Biloxi II, LLC property and the west line of said Lot 9; thence South 00 degrees 15 minutes 45 seconds East 589.31 feet along the West line of said Lot 9 and the DB Biloxi II, LLC property to a chiseled mark found in a concrete drive and the northern margin of U.S. Highway 90; thence South 79 degrees 44 minutes 15 seconds West 103.16 feet along said northern margin of U.S. Highway 90 to an iron rod found at the northern edge of an existing concrete sidewalk and the southeast corner of the property conveyed to B & C Enterprises, inc., per Deed Book 102, Page 370; thence North 00 degrees 19 minutes 56 seconds West 992.29 feet to an iron pipe found and the south line of said Paul M. Skrmetti's Greater Biloxi Subdivision; thence North 88 degrees 56 minutes 24 seconds East 102.40 feet, along said south line, to an iron pipe found; thence South 89 degrees 56 minutes 56 seconds East 192.24 feet along said south line of Paul M. Skrmetti's Greater Biloxi Subdivision, to the POINT OF BEGINNING.

Said parcel containing 4.017 acres, more or less, and being the property conveyed to DB Biloxi II, LLC, per Instrument Number 2005-0006171-DJ2, on file in the office of the Chancery Clerk of the Second Judicial District of Harrison County, Mississippi.

EXHIBIT D

FORM OF GUARANTY

EXHIBIT E

MS. HAMILL PROPERTY

EXHIBIT C

## LEGAL DESCRIPTION OF HAMILL PARCEL

A PARCEL OF LAND SITUATED IN AND BEING A PART OF LOT 12, OF THE L.A. FREDERICK SURVEY, LOCATED IN FRACTIONAL SECTION 35, TOWNSHIP 7 SOUTH, RANGE 10 WEST, CITY OF BILOXI, SECOND JUDICIAL DISTRICT OF HARRISON COUNTY, MISSISSIPPI, AND BEING MORE PARTICULARLY DESCRIBED AS FOLLOWS:

COMMENCE at an iron pipe found at the intersection of the east line of Lot 9 of the L. A. Frederick Survey with the south line of the Paul M. Skrmetti's Greater Biloxi Subdivision; Thence North 89 degrees 56 minutes 56 seconds West 192.24 feet to along the south line of said Paul M. Skrmetti's Greater Biloxi Subdivision to an iron pipe found; thence South 88 degrees 56 minutes 24 seconds West 102.40 feet, along the south line of said Paul M. Skrmetti's Greater Biloxi Subdivision, to an iron pipe found at the northeast corner of the property conveyed to B&C Enterprises, Inc. per Deed Book 102, Page 370, the northwest corner of the property conveyed to DB Biloxi, II, L.L.C. per Instrument Number 2005-0006171-DJ2; thence South 89 degrees 44 minutes 20 seconds West 287.25 feet, along the south line of said Paul M. Skrmetti's Greater Biloxi Subdivision, to an iron rod set at the northeast corner of the property conveyed to C.C. Hamill and wife Marguerite V. Hamill, per Deed Book 122, Page 169 and the POINT OF BEGINNING of the property herein described;

Thence South 00 degrees 17 minutes 49 seconds East 652.89 feet, along the west line of said B&C Enterprises, Inc. property, and also along the east line of said Hamill property, to an iron pipe found at the southeast corner of said Hamill property and the northeast corner of the property conveyed to Ronald C. Pierotich and J.J. Pierotich per Deed Book 238, Page 375; thence South 89 degrees 47 minutes 59 seconds West 82.14 feet along the north line of said Pierotich property to a point in a ±16" palm tree at the northwest corner of said Pierotich property, said point being witnessed by an iron rod set North 89 degrees 47 minutes 59 East 2.00 feet and an iron rod set North 00 degrees 17 minutes 10 seconds West 2.00 feet, said point also lying on the east line of the property conveyed to A. Jake Mladinich, II, and wife, June S. Mladinich per Deed Book 284, Page 531; thence North 00 degrees 17 minutes 10 seconds West 652.79 feet along the east line of said Mladinich property, the west line of said Hamill property, the west line of the property conveyed to C.C. Hamill and Marguerite V. Hamill per Copy Book 120, Page 96, and the property conveyed to C.C. Hamill and wife Marguerite V. Hamill per Copy Book 120, Page 281, to an iron pipe found on the south line of the Paul M. Skrmetti's Greater Biloxi Subdivision and also the northeast corner of said Mladinich property; thence North 89 degrees 44 minutes 20 seconds East 287.25 feet, along said south line of Paul M. Skrmetti's Greater Biloxi Subdivision, to the POINT OF BEGINNING.

Said parcel containing 1.230 acres, more or less, and being the properties conveyed to C.C. Hamill and wife Marguerite V. Hamill per Deed Book 122, Page 169, the property conveyed to C.C. Hamill and wife Marguerite V. Hamill per Copy Book 120, Page 281, and the property conveyed to C.C. Hamill and wife Marguerite V. Hamill per Copy Book 120, Page 96, all on file

1/11/2004 4:24 PM (XX)
MIAMI 63053.4 W [63053L_1.DOC]

in the office of the Chancery Clerk of the Second Judicial District of Harrison County, Mississippi.