# EXHIBIT F

COPY

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
07 CIV. 9385 (JFK)
------------------------------------x
SAMSARA INVESTMENT III, LLC,

      Plaintiff,

   vs.

JERRY L. WALLACE,

      Defendant.
------------------------------------x

                May 12, 2008
                8:20 a.m.

    Deposition of Jerry L. Wallace,
held at the offices of Haynes & Boone, LLP,
153 East 53rd Street, New York, New York,
pursuant to Court Order, before Francine
Sky, a Notary Public of the State of New
York.

186

Jerry L. Wallace

1  
2  project.
3  Q. When did you buy his interest out?
4  A. 2006.
5  Q. Do you recall how much you paid
6  Mr. Heath for that?
7  A. I didn't actually pay him a fee. I
8  really believe that he was paid through the
9  price of the land, because he was involved in
10 the land itself, and I believe that's the way
11 he was paid.
12         Now, as far as getting a loan for
13 this, I paid him a very handsome fee for
14 setting up the loan with the construction loan
15 that we had set up for the land purchase.
16 Q. Who was that loan with?
17 A. That was with Kennedy Funding.
18 Q. How much did you pay Mr. Heath for
19 that?
20 A. 5 percent.
21 Q. Did you have a written agreement
22 with him for that?
23 A. I'm fairly sure that we do.
24 Q. Did he get 5 percent of the loan?
25 A. He got 5 percent of the loan.

225

Jerry L. Wallace

1  Jerry L. Wallace
2           A F T E R N O O N   S E S S I O N
3              (Time noted:  2:08 p.m.)
4
5  J E R R Y   L.   W A L L A C E,   resumed
6       and testified as follows:
7
8  EXAMINATION (Cont'd.)
9  BY MR. PRESSMENT:
10             MR. PRESSMENT:   Back on the
11 record.
12        Q.    Mr. Wallace, we're returning from a
13 break.  During the break did you have occasion
14 to review Exhibit 17, which was your Principal
15 Guaranty?
16        A.    I did.
17        Q.    Are you able to identify any
18 provision in the Principal Guaranty, Exhibit
19 17, that was not in the version sent to you by
20 Jason Simon under cover of Exhibit 13 of your
21 deposition here today --
22        A.    No.
23        Q.    -- for your execution?
24        A.    No.
25        Q.    So to your knowledge, the document

```
                                                      226
 1                    Jerry L. Wallace
 2   you signed was the document that was forwarded
 3   to you by counsel; correct?
 4        A.    Correct.
 5        Q.    And you signed that willingly;
 6   correct?
 7        A.    Yes.
 8        Q.    And agreed to be bound by its
 9   provisions; correct?
10        A.    Yes.
11        Q.    And following the execution of the
12   Agreement and in connection with that, Samsara
13   invested $6 million in Shores of Paradise;
14   correct?
15        A.    Correct.
16        Q.    And for that investment, it was to
17   be entitled to a guaranteed return in
18   accordance with the terms of the Operating
19   Agreement; correct?
20        A.    Correct.
21        Q.    And you agreed to those terms;
22   correct?
23        A.    Correct.
24        Q.    And that is the Operating Agreement
25   that you signed and which is part of your
```

227

1    Jerry L. Wallace
2  deposition as Exhibit No. 15; correct?
3       A.    Yes.
4       Q.    Mr. Wallace, following the
5  execution of the Amended Operating Agreement,
6  what, if any, activities did you conduct in
7  connection with the Shores of Paradise
8  property?
9       A.    We -- let me think here. We had
10 the sales there prior to Katrina.
11            Is this before or after Katrina,
12 please, somebody tell me?
13      Q.    It's after.
14      A.    After Katrina, okay. Actually, we
15 had to wait to find out about the market and
16 about the bank that we were going to get a
17 construction loan with. This was only a land
18 loan.
19            And we had, if I'm not mistaken, we
20 had American National Bank, I think, was the
21 construction lender, I think, and we were
22 waiting to see what was going to happen after
23 the aftermath of Katrina to determine what to
24 do. We just cannot know what to do.
25            And that took time, so there really

1           Jerry L. Wallace
2  ahead and closed, because we would have lost
3  it.
4       Q.   Did you follow up to seek any
5  construction finance upon closing on the land?
6       A.   We already had construction
7  financing.  We already had it set up with, if
8  I'm not mistaken, according to Edward Heath, I
9  think it was -- American National Bank was
10 prepared to do that, but they were stalling,
11 waiting on seeing what the market was going to
12 do.
13          So we really couldn't do anything
14 until the bank decided what they were going to
15 do.  Because we did have sales.
16      Q.   When you say "the bank," are you
17 talking about Kennedy Funding?
18      A.   No, we are talking about
19 construction funding.  Kennedy Funding was
20 land loan, so was Samsara.
21      Q.   And so with respect to the bank,
22 what bank are you referring to?
23      A.   I think First National Bank --
24 American National Bank, if I'm not mistaken.
25      Q.   At what point did you start taking

235

1              Jerry L. Wallace
2  Heath was.
3       Q.   Did you ever get access to funds to
4  commence construction of Shores of Paradise?
5       A.   No.
6       Q.   So how would you summarize your
7  activities with respect to the project over
8  that year?  Between February 23, 2006, when
9  you signed the Samsara agreements, through the
10 end of the year, December 31, 2006, what, if
11 any, activities did you conduct with respect
12 to the Shores of Paradise project?
13      A.   We talked to customers.  I talked
14 to Kennedy Funding about it, because they
15 didn't know what was going to happen and
16 wanted to know.
17           I also made payments during that
18 time at $120,000 a month.
19      Q.   To...?
20      A.   To Kennedy Funding.  And we,
21 basically, had to figure out what the banks
22 wanted to do about going forward, and this is
23 -- not in those times, it was really like
24 pulling teeth to get decisions out of anybody,
25 because nobody knew what to do, really.

237

1           Jerry L. Wallace
2  assets but I had no cash.
3           Then I paid the rest of the cash I
4  had to Kennedy during that year, that's
5  whenever I had to call -- when I gave out of
6  cash, that's when I had to call and holler for
7  help.
8       Q.   When was that, approximately?
9       A.   I'm guessing probably around
10 September of this past year.
11      Q.   September 2007?
12      A.   Yeah.  Something like that.
13      Q.   When you say call out for help,
14 what do you mean by that?
15      A.   I can't make any more payments.
16 That means call Sachin and told him that
17 somebody's gotta make the payments.  I can't
18 make it anymore.
19      Q.   That's December 2007?
20      A.   I'm guessing at that.  I think so.
21      Q.   And to your recollection that was
22 the first time you contacted Mr. Shah about
23 stepping in to make payments with respect to
24 Shores of Paradise?
25      A.   Yes.

```
                                                    281
                        Jerry L. Wallace
   record.
               (Plaintiff's Exhibit 28, Two-page
        document Bates stamped SAM 3765 through
        3766, marked for identification.)
        Q.    Mr. Wallace, I'm handing you what
   has been marked as Exhibit 28 for this
   deposition.  It's a two-page document Bates
   marked SAM 3765 through 3766.
               I want to direct your attention
   first to the e-mail from you, Jerry Wallace,
   to Sachin Shah, at the bottom of the page,
   continuing to Page 2, dated May 18, 2007.  If
   you turn the page you'll see the date.  The
   subject of that e-mail is "payoff," and you
   write:  "Would your group take $9 million if
   paid off in full by July 1st?"
               Do you see that?
        A.    A-ha.
        Q.    Do you recall writing that to
   Mr. Shah?
        A.    Yeah, I think so.
        Q.    Mr. Wallace, was it your
   understanding as of this date, May 2007, that
   in connection with this transaction, Samsara
```

282

1           Jerry L. Wallace
2   made an initial investment of $6 million,
3   which, pursuant to the Operating and
4   Investment Agreements and the Guaranty, they
5   were to get a return of 10.2 million by
6   February 26, 2007?
7        A.   Yes.
8        Q.   That was your understanding as to
9   the agreement?
10       A.   Yes.
11       Q.   Is that your understanding today as
12  to the agreement?
13       A.   Yes.
14       Q.   And Samsara made that $6 million;
15  correct?
16       A.   They did what?
17       Q.   They made that investment of $6
18  million; correct?
19       A.   Yes.
20       Q.   And it is your understanding, and
21  you would agree with me, that pursuant to the
22  terms of your agreement with Samsara, Samsara
23  is entitled to a return of $10.2 million on
24  that initial investment plus interest;
25  correct?

```
                                                    283
 1                  Jerry L. Wallace
 2         A.    Yes.
 3         Q.    And Samsara hasn't been paid a dime
 4   towards that $10.2 million plus interest that
 5   they're owed; correct?
 6         A.    That's correct.
 7         Q.    And you do not contest the fact
 8   that Samsara is owed that money; correct?
 9         A.    No.
10         Q.    The only thing you contend is that
11   you may not have the funds to be able to pay
12   them back; correct?
13         A.    That's a fact.
14         Q.    But that's the only thing.  You
15   don't contest the fact that Samsara is owed
16   that money; correct?
17         A.    I don't contest that they're owed
18   the money.
19         Q.    And with respect to your role as
20   Managing Member of Shores of Paradise, we
21   established that continued until at least July
22   or August of 2007; correct?
23         A.    That's correct.
24         Q.    And actually, it continued past
25   that, didn't it?
```

302

C E R T I F I C A T E

STATE OF NEW YORK    )
                     : ss.
COUNTY OF NEW YORK   )

I, FRANCINE SKY, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That JERRY L. WALLACE, the witness whose deposition is hereinbefore set forth, was duly sworn by me and that such deposition is a true record of the testimony given by the witness.

I further certify that I am not related to any of the parties to this action by blood or marriage, and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this 23rd day of May, 2008.

*[signature]*

FRANCINE SKY